Opinion
 

 KAUS, P. J.
 

 After defendant’s unsuccessful motion to suppress evidence, a jury found him guilty of one count of first degree robbery (Pen. Code, § 211) and one count of kidnaping for the purpose of robbery
 
 *930
 
 (Pen. Code, § 209). The jury also found that defendant had been armed with a firearm during the commission of the robbery within the meaning of Penal Code sections 12022.5 and 1203.06, subdivision (a)(1). Defendant admitted two prior felony convictions, a robbery and a burglary.
 
 [1]
 
 On November 2, 1977, he was sentenced to state prison for the terms prescribed by law, the terms on the two counts to run concurrently. The sentence on the kidnaping count was stayed pending appeal, the stay to become permanent upon completion of the terms on the robbery count. Defendant appeals from the judgment.
 

 Facts
 

 1. Motion to Suppress Evidence.
 

 On January 28, 1977, at about 8:45 a.m., Los Angeles Police Officer Jack Reidy received a radio call that burglars were loading or unloading a vehicle at a residence at 840-842 West 79th Street. Reidy arrived at the location within five minutes of the broadcast, but no vehicle was present. He did, however, see dual tire tread marks on a nearby curb. A witness told him that she had seen a large blue or green truck parked in the driveway. Reidy put out a “no further assistance needed” broadcast and left.
 

 At about 10:05 a.m. that same day, Officer Charles Buckland received a radio broadcast to the effect that a Royal Wholesale Cigar Company truck had been hijacked. Buckland had heard the earlier broadcast and the “all clear” sent out by Reidy. Buckland interviewed the driver of the truck, a Mr. Williams, who told him that the truck’s cargo had consisted of cases of cigarettes, candy, and sundries. Williams said that a man had accosted him with a gun, had ordered him onto the floorboard and had driven the truck to a location unknown to Williams. At the location, he felt the truck bump and rub along the curb when it was being backed up. A woman who was apparently armed with a gun then entered the truck and threatened to kill Williams. Meanwhile, two people were apparently unloading the truck. Williams described his truck as a blue Chevrolet with dual wheels.
 

 
 *931
 
 Remembering the earlier broadcast, Buckland consulted with Reidy to ask what he had found at the 840-842 79th Street location. The two met there at about 11:30 or 11:45 a.m. and compared notes. Also present were an Officer Hoar and a young police cadet named McGuire.
 

 The officers set up a surveillance of the 79th Street residence. At about 1 or 1:15 p.m., they were joined by Officer Maurice Nordenstrom, who had been advised of the information gathered by Reidy and Buckland. Nordenstrom stationed himself in an apartment building across the street from 840-842 and the other officers took positions nearby. The officers maintained radio contact with each other.
 

 Defendant arrived at the location at about 1:30 p.m., entered through the rear door, and left a few minutes later. He returned, entered and left after a short period of time at about 3 p.m. At about 3:30, another man, later identified as a Mr. Quiller, arrived, entered, and left. Defendant returned at 4 and a third man, later identified as Leonard Pentalion, arrived at 4:05 and was beckoned by defendant to enter through the rear door. A short time later, defendant and Pentalion left in Pentalion’s Volkswagen.
 

 By 7 p.m., defendant, Quiller and Pentalion had all returned. Defendant and Pentalion began to carry half cases of cigarettes out of the apartment. Both men appeared cautious, Pentalion looking up and down the street and defendant ducking into the shadows when he saw a vehicle drive by. Pentalion loaded the half cases into his Volkswagen and defendant put the ones he was carrying into his Thunderbird. As each man got into his car and began to drive away, Officer Nordenstrom broadcast to his fellow officers to close in.
 

 Nordenstrom and Buckland stopped defendant’s car, placed him under arrest and searched him. No weapon was found. Meanwhile, Reidy stopped Pentalion’s car and placed him under arrest. A pat-down search of Pentalion revealed no weapon. Nordenstrom and Reidy conferred about the fact that neither had discovered the gun that had reportedly been used in the hijacking.
 

 Nordenstrom and Reidy then approached the apartment, Nordenstrom going to the rear door and Reidy to the front door. Nordenstrom knocked on the rear door and said, “Police officers.” When he received no response, he walked around to the front. Reidy encountered Quiller leaving through the front door and arrested him. A pat-down revealed no
 
 *932
 
 weapon. Reidy asked Quiller whether anyone else was inside and Quiller stated that there was a woman in the bedroom. Reidy told Nordenstrom that he had found no weapon on Quiller and what Quiller had told him.
 

 Nordenstrom then went to the front door, which was standing wide open. He knocked and stated loudly, “Police officers, you are under arrest.” After waiting 15 or 20 seconds and receiving no response, Nordenstrom decided that he was faced with an emergency: the woman in the house was a. suspect in the kidnap robbery, she probably possessed the gun she had used during the offense and, since the other occupants of the apartment had been placed under arrest, she might well try to escape. Nordenstrom entered the apartment and found a woman—Esther Ceja—apparently asleep on the bed. He told her that she was under arrest for robbery and led her through the hallway toward the front door. In the hall, he saw through the open door of another bedroom a number of half cases of cigarettes.
 

 In the living room, they met Officer Buckland, who had entered to assist Nordenstrom. The woman asked Buckland if she could put on her shoes which were in the bedroom. Back in the bedroom, the woman began to get her shoes, which were beside the bed. Buckland stopped her and looked under the pillow or mattress at the head of the bed and found a loaded .357 magnum revolver.
 

 2. The Trial.
 

 Much of the testimony at trial was a repetition of
 
 that at the
 
 suppression motion. In addition, testimony was taken from Robert Williams, the victim of the robbery-kidnap. Williams gave this version of the incident:
 

 On January 28, 1977, Williams was employed as a truck driver for the Royal Wholesale Cigar Company. At about 8:05 a.m., he had just completed a delivery of merchandise at a liquor store when he was accosted by a man with a gun
 
 [2]
 
 who ordered him to lie down on the floor in the cab of the truck. After Williams complied, the gunman tried to start the truck but could not do so. Williams told the gunman that there was a safety switch under the ignition which had to be activated. Eventually, the gunman got the truck started and drove it away.
 

 
 *933
 
 After the truck had traveled what seemed to Williams to be a few miles, it came to a stop. A woman entered the truck and suggested that Williams be tied up, which was done. While two men unloaded the truck, the woman stayed with Williams. At one point she stated that if the police came he would be dead.
 

 The gunman then reentered the cab and drove for about four or five miles. He stopped the truck, told Williams not to get out for 15 minutes and left. Williams untied himself and went to a nearby home, from which he called the police.
 

 Leonard Pentalion also testified as a witness for the People. He had known defendant for about 20 years. After spending the early morning hours of January 28, 1977, as a witness in a trial, Pentalion went to a bar and then arrived at his home at about 3:30 p.m. At that time, Pentalion spoke by telephone to defendant, who told him that he had 55 half cases of cigarettes that he wanted to “get rid of.” Pentalion went to the address provided by defendant and there met defendant and a woman named Esther Ceja.
 

 Defendant and Pentalion left to go to a liquor store where they thought they could sell the cigarettes. As they drove, Pentalion asked where the cigarettes had come from. Defendant told Pentalion about the robbery-kidnap, identifying himself as the gunman and the other man involved as one Quiller. He specifically told Pentalion about the trouble he had had starting the truck and how he “had to find a button” to start it.
 

 Eventually defendant and Pentalion returned to the 79th Street residence and, after making further arrangements, began to load the cigarettes into their cars. They were placed under arrest at about 7 p.m. and taken to jail along with Quiller and Esther Ceja. At the jail, Pentalion repeatedly asked defendant to “cut [him] loose” to which defendant replied, “Well, go for yourself, you got a ‘receiving,’ we all got a receiving.”
 

 Defendant was advised of his constitutional rights and interviewed by Sergeant James R. Barrett. He denied that he had taken the cigarettes and stated that “all the people involved in the robbery were not in custody.”
 

 Testifying in his own defense, defendant denied participation in the robbery-kidnap. He stated that the gunman was a man named “Cue.”
 
 *934
 
 Cue had called defendant in the afternoon on January 28, 1977, and had asked if he could sell some cigarettes. When defendant arrived at the 79th Street residence, Quiller and Esther Ceja were there and Cue never appeared. Defendant in turn called Pentalion to help him sell the cigarettes. Defendant denied that he told Pentalion that he had been involved in the hijacking of the truck.
 

 The defense also called Robert Sexton, a fingerprint expert for the Los Angeles Police Department. Latent fingerprints taken from the outside of the Royal Wholesale Cigar Company truck were identified as belonging to Esther Ceja and Quiller. Defendant’s fingerprints were not found anywhere on the truck.
 

 Issues
 

 On appeal, defendant contends:
 

 1. The warrantless entry into the 79th Street residence was unlawful because there was no emergency and the police officers failed to comply with the “knock and notice” requirements of Penal Code section 844.
 

 2. Defendant was deprived of a crucial defense when prospective defense witness Esther Ceja was excused after she indicated that she would invoke her privilege against self-incrimination.
 

 3. Defendant was not fully warned of the consequences of admitting prior felony convictions.
 

 Discussion
 

 1. Warrantless Entry.
 

 Defendant first claims that the warrantless entry into the 79th Street residence was unlawful because the police failed to adhere to the “knock and notice” requirement of Penal Code section 844. However, since trial counsel failed to raise this theory in his motion to suppress below, the point may not now be raised for the first time.
 
 (People
 
 v.
 
 Lopez
 
 (1978) 81 Cal.App.3d 103, 108 [146 Cal.Rptr. 165];
 
 People
 
 v.
 
 Johnson
 
 (1970) 5 Cal.App.3d 851, 863 [85 Cal.Rptr. 485].)
 

 
 *935
 
 In any event, the answer to the knock and notice argument is implicit in the answer to defendant’s second contention—that the circumstances the officers were faced with were not sufficiently exigent to justify their warrantless entry. Emergency situations which excuse compliance with the warrant requirement also excuse compliance with the strictures of Penal Code section 844. (See
 
 People
 
 v.
 
 Tribble
 
 (1971) 4 Cal.3d 826, 833 [94 Cal.Rptr. 613, 484 P.2d 589];
 
 People
 
 v.
 
 Bigham
 
 (1975) 49 Cal.App.3d 73, 79 [122 Cal.Rptr. 252].)
 

 In
 
 People
 
 v.
 
 Ramey
 
 (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333], the court defined “exigent circumstances” which make the procurement of an arrest warrant unnecessary as “an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence.” The court recognized that “[t]here is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers.”
 
 (Id.)
 
 Here the officers had arrested three men who had just emerged from a residence which apparently contained the bulk of the contraband stolen in the robbery-kidnap. The front door of the residence was standing wide open. They were told that a woman was still inside and they knew that a woman had participated in the crime. Moreover, a gun had been used in the robbery-kidnap and no such weapon had been found on the three men. They also had learned from the victim of the crime that the woman had threatened his life. When Officer Nordenstrom’s knocks and identifications of himself as a police officer met with no response, it was reasonable for him to conclude that the armed suspect inside might try to shoot his way out. His immediate entry was justified by these circumstances (see
 
 People
 
 v.
 
 Smith
 
 (1966) 63 Cal.2d 779, 797 [48 Cal.Rptr. 382, 409 P.2d 222].) The later seizure of the contraband which was in plain view inside the residence, was lawful.
 
 (People
 
 v.
 
 Gilbert
 
 (1965) 63 Cal.2d 690, 707 [47 Cal.Rptr. 909, 408 P.2d 365], revd. on other grounds in
 
 Gilbert
 
 v.
 
 California
 
 (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951].)
 

 We cannot agree with defendant that the emergency was “of the ‘do-it-yourself’ variety.”
 
 (Shuey
 
 v.
 
 Superior Court
 
 (1973) 30 Cal.App.3d 535, 541 [106 Cal.Rptr. 452].) Before the men emerged from the house carrying half-cases of cigarettes, the officers possessed only sketchy information tying the residence to the hijacking of the truck. However, once the men did come out carrying the cases, it was reasonable for the officers to place them under arrest immediately, rather than allowing
 
 *936
 
 them to dispose of the contraband. To require police officers in this situation to obtain a warrant before entering the house would be to ignore reality: there can be little doubt that the woman inside would have learned of the arrests before the search warrant could have been issued. (See
 
 People
 
 v.
 
 Freeny
 
 (1974) 37 Cal.App.3d 20, 32-33 [112 Cal.Rptr. 33].) The probability of an armed escape attempt under those circumstances would have been greatly increased.
 

 2.
 
 Deprivation of a Crucial Defense Witness.
 

 After the People had rested their case in chief, the court stated out of the presence of the jury that it had received a note which read as follows:
 

 “Dear Judge Barrett:
 

 “I would like to testify for Mr. Kizzee, but I can’t due to the fact it would be going against my plea bargain that I accepted a deal on September 14th, 1977. Please excuse me from coming to court on this case. Thank you. [If] Esther Ceja.”
 

 At no time during the proceedings which followed did Ms. Ceja abandon that position: were it not for her plea bargain, she wanted to testify for defendant.'
 

 Defense counsel, in turn, made an adequate offer of proof of what her testimony would be: he expected her to back up certain statements which she had given to the police and which exonerated his client as far as the robbery charges were concerned; further, he expected her to give certain evidence which would strongly impeach Pentalion as a witness.
 

 Still outside the presense of the jury, three witnesses were sworn: Esther Ceja, her attorney Silvio Marcario, and Judge Donahue, who, earlier that month, had accepted her plea of guilty to a charge of robbery. From their testimony it became clear that Ms. Ceja had not yet been sentenced on the robbery. She swore that if called as a witness she would invoke her Fifth Amendment privilege against self-incrimination because “the plea bargain was that I take a guilty plea to a gun allegation and a robbery, and that I won’t testify for Mr. Kizzee in his behalf or not in his behalf.” Mr. Marcario testified that although he had entered into no such bargain with the district attorney, “the judge said that he didn’t want her lying, and I have assured him from my conversation with Miss Ceja that she didn’t intend to testify.” Judge Donahue summed up the discussion
 
 *937
 
 as follows: “I think there was quite a long discussion concerning a plea bargain, and Mr. Marcario did come back to the chambers, said his client was not going to testify, and the plea bargain was she’d plead guilty to the charge and admit the use, and I’d strike the prior, but when he did say that she wasn’t going to testify, I said,
 
 ‘Good, because if she got on the stand and lied, I wouldn’t strike the prior,’ and I did say that.”
 
 (Italics added.) Judge Donahue and the deputy district attorney then made it clear that they would allow Ms. Ceja to withdraw her plea so that she would be “free to testify,” but she stated that she wanted to “stick to my plea bargain.” The court then asked defense counsel if he wished to ask anything further of Ms. Ceja, to which defense counsel replied, “No. Under those circumstances, we will not be calling her as a witness.”
 

 It appears that Ms. Ceja and her attorney interpreted the plea bargain as encompassing an assurance that she would not testify at defendant’s trial either “in his behalf or not in his behalf.” Judge Donahue was more down to earth: he specifically admitted that “if she got on the stand and lied, I wouldn’t strike the prior.” In context it is quite clear that Judge Donahue and no one but Judge Donahue was to determine whether or not she had lied.
 

 If the trial judge himself had exercised this type of judicial pressure on a prospective defense witness, there would be no doubt that the defendant would have been deprived of due process.
 
 (Webb
 
 v.
 
 Texas
 
 (1972) 409 U.S. 95, 97-98 [34 L.Ed.2d 330, 332-333, 93 S.Ct. 351].) Yet from a constitutional point of view it can make no difference that the pressure was being exercised by Judge Donahue while Judge Barrett, the trial judge, virtually became a spectator in his own court, powerless to prevent Judge Donahue from injecting error into the record.
 

 It seems to us that the only out available to the People is that the defense did not make a proper record. While Ms. Ceja did swear under oath that if called as a witness she would exercise her privilege against self-incrimination, the matter was never formally put to the test in the sense that she was asked a relevant question and actually declined to answer it on self-incrimination grounds. If it were the law that she had no privilege at the time because she had already pleaded guilty, we would have to assume that the trial court would have ruled to that effect, ordered her to testify and that she would have obeyed. Since, however, it is quite clear to us that Ms. Ceja would have been within her rights in
 
 *938
 
 claiming the privilege, it hardly makes a difference that she was not forced to do so in more ceremonial fashion.
 
 [3]
 

 What was Ms. Ceja’s status with respect to her privilege against self-incrimination—in other words, does it survive a guilty plea at least until the defendant has been sentenced? A dictum in
 
 Ex parte Cohen
 
 (1894) 104 Cal. 524, 528 [38 P. 364], suggests that the privilege survives until the defendant “has satisfied the sentence of the law.” Another Dictum in
 
 Rebstock
 
 v.
 
 Superior Court
 
 (1905) 146 Cal. 308, 313 [80 P. 65], casually shortens the time until the defendant’s “conviction,” but we are not told whether this term is meant to encompass the pronouncement of judgment, the sentence. Cases from other jurisdictions, collected in an annotation at 9 A.L.R.3d 990, are inconclusive. This specifically includes cases decided by the United States Supreme Court.
 
 [4]
 

 Whatever may be the federal rule—yet to be announced by the United States Supreme Court—our California Supreme Court has shown particular independence in interpreting the self-incrimination provision in our state Constitution—article I, section 15. (See, for example,
 
 Allen
 
 v.
 
 Superior Court
 
 (1976) 18 Cal.3d 520, 525 [134 Cal.Rptr.
 
 11 A;
 
 557 P.2d 65];
 
 Reynolds
 
 v.
 
 Superior Court
 
 (1974) 12 Cal.3d 834, 842-843 [117 Cal.Rptr. 437, 528 P.2d 45].) The real question is, therefore, whether Ms. Ceja had lost her privilege against self-incrimination under the California Constitution. We are persuaded that she had not. As noted none of our state authorities is dispositive of the problem. Persuasive however is the opinion of the Supreme Court of New Jersey,
 
 State
 
 v.
 
 Tyson
 
 (1964) 43 N.J. 411 [204 A.2d 864, 866-867], That court held specifically that an accused does not lose his privilege against self-incrimination until he has been sentenced chiefly, in the court’s view, because until sentence has been pronounced a defendant has a right to move to withdraw the plea and is entitled to a liberal exercise of the trial court’s discretion in ruling
 
 *939
 
 on his motion.
 
 [5]
 
 The wisdom of such a rule is particularly evident in a case such as the present one where the plea was pursuant to a bargain which, apparently, left several matters to the trial court’s discretion—a discretion which that court freely admitted would be influenced by the nature of Ms. Ceja’s statements about the crime between plea and sentence.
 

 We therefore hold that Ms. Ceja would have been within her constitutional rights had she expressly done what she had sworn she would do—claimed her privilege against self-incrimination—and that under the circumstances there was no need for defense counsel to make a further record.
 

 Therefore, since Judge Donahue’s coercive threat deprived defendant of a vital witness, we have little choice as far as the disposition of this appeal is concerned. We must reverse.
 

 The only additional problem which might arise on retrial is defendant’s claim, based on
 
 In re Yurko
 
 (1974) 10 Cal.3d 857, 864-865 [112 Cal.Rptr. 513, 519 P.2d 561], that the trial court is required to apprise him of the possible effect his admission of the 1960 robbery conviction would have on his term as recomputed under the Determinate Sentencing Act. (See Pen. Code, § 1170.2.) Defendant admitted that he had served a prior prison term for that offense and that he had not remained free of prison custody for a period of five years before the commission of the offense charged in the present case. Should defendant make these same admissions on retrial, and should he once again be convicted of the instant offense, the Community Release Board is mandated by statute to add an enhancement of one year to defendant’s recomputed determinate term. (Pen. Code, §§ 667.5, 1170.2, subd. (a).) Although we need not decide whether
 
 Yurko
 
 applies in these circumstances because of our reversal on another ground, out of an excess of caution we suggest that if defendant indicates that he wishes to make these same admissions on retrial, the trial court should advise him of the one-year enhancement.
 

 Reversed.
 

 Stephens, J., and Hastings, J., concurred.
 

 A petition for a rehearing was denied August 1, 1979. Hastings, J., was of the opinion that the petition should be granted. Respondent’s petition for a hearing by the Supreme Court was denied September 6, 1979.
 

 [1]
 

 The People concede on appeal that the burglary conviction was a misdemeanor. Since we conclude that the judgment must be reversed in any event, we are confident that any error resulting from the mistaken assumption that it was a felony will not be repeated on retrial.
 

 [2]
 

 Williams testified that the gunman was about defendant’s size, although he could not positively identify defendant as the man. However, Williams also testified that one of the “people that participated” in the crime had told him, “If you identify anybody, I know where you live.”
 

 [3]
 

 This case thus differs from
 
 People
 
 v.
 
 Sierra
 
 (1953) 117 Cal.App.2d 649 [256 P.2d 577] and
 
 People
 
 v.
 
 Clayton
 
 (1961) 192 Cal.App.2d 148 [13 Cal. tr. 241]. In
 
 Sierra
 
 the court held that the witness had no privilege, in
 
 Clayton
 
 it so assumed.
 

 [4]
 

 Namet
 
 v.
 
 United States
 
 (1963) 373 U.S. 179, 188 [10 L.Ed.2d 278, 284, 83 S.Ct. 1151] contains a dictum that a mere plea of guilty erases any testimonial privilege. It cites
 
 Reina
 
 v.
 
 United States
 
 (1960) 364 U.S. 507, 513 [5 L.Ed.2d 249, 255, 81 S.Ct. 260], where the court spoke of the privilege not surviving a “conviction,” the fact being, however, that the witness in question had not only been convicted, but was actually serving his sentence. Finally there are cases such as
 
 Boykin
 
 v.
 
 Alabama
 
 (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709] and the hundreds that follow it, holding that a plea of guilty constitutes a waiver of the privilege against self-incrimination. It is, however, impossible to read
 
 Boykin
 
 and its issue as holding that a mere plea—not followed by the pronouncement of judgment—constitutes such a waiver.
 

 [5]
 

 In this respect New Jersey law appears to follow the literal language of section 1018 of the California Penal Code.