[Crim. No. 20339. July 3, 1980.]

In re JOE R., a Person Coming Under the Juvenile Court Law.
KENNETH F. FARE, as Acting Chief Probation Officer, etc.,
Plaintiff and Respondent, v.
JOE R., Defendant and Appellant.

COUNSEL

William T. Harter, under appointment by the Supreme Court, and Roger S. Hanson for Defendant and Appellant.

Evelle J. Younger and George Deukmejian, Attorneys General, Jack R. Winkler and Robert H. Philibosian, Chief Assistant Attorneys General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., William R. Weisman, Gary R. Hahn and Carol Slater Frederick, Deputy Attorneys General, for Plaintiff and Respondent.

Cecil Hicks, District Attorney (Orange), Michael R. Capizzi, Assistant District Attorney, Oretta D. Sears, Deputy District Attorney, D. Lowell Jensen, District Attorney (Alameda), John J. Meehan, Assistant District Attorney, and William M. Baldwin, Deputy District Attorney, as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

NEWMAN, J.—A juvenile court petition filed against Joe R., a minor, charged him with two robberies (Pen. Code, § 211) and a murder (Pen. Code, § 187). (See Welf. & Inst. Code, § 602.) After hearing, the court

found all charges true, declared him a ward of the court, and committed him to the California Youth Authority.

He appeals, contending that (1) the murder allegation is not supported by the evidence, and (2) the court wrongly denied his motion to suppress (a) certain physical evidence as the fruit of two illegal searches, and (b) a confession as tainted by those searches, coerced by threats, and obtained in violation of his *Miranda* rights.[1]

On June 1, 1976, Renard Murray was working as night manager of the Taco Bell food stand at 60th and Crenshaw in Los Angeles. About 20 minutes after midnight the minor and another young male, Michael Ryles, approached the service window. As they approached, Murray saw each was pointing a pistol at him. Ryles ordered him to take money from the cash register and put it in a Taco Bell bag. The pair took approximately $140 in various denominations, including a large number of one dollar bills, and about $50 in change wrapped in rolls. Murray also was forced to surrender cash on his person.

The robbers fled in the car of the minor's mother, parked nearby. While driving they saw Wayne Anderson sitting on a bus bench at the corner of Century and Vermont, and they decided to rob him. They parked the car and approached him at about 45 minutes past midnight. Ryles asked Anderson questions and then, pointing his gun at Anderson's head, announced it was a robbery.

Ryles ordered Anderson to walk behind nearby buildings—a gas station and a weight-control center. As they walked, Ryles repeatedly asked for money; and Anderson said he had no money. Both robbers made threats on his life. On direct examination he testified that the minor said, "If you don't do what he says I'll kill you" and "If you don't do what he says he'll kill you." On cross-examination, however, Anderson agreed that the minor never said he (the minor) would do anything to Anderson. Anderson never saw the minor display a gun.

The group stopped behind the buildings, and Ryles ordered Anderson to give his coat and watch to the minor. Anderson complied and repeat-

---

[1]The minor attempts to raise the murder issue by contending that his Penal Code section 1118 motion for acquittal at the close of the People's case was improperly denied. Penal Code section 1118 was recently held inapplicable to juvenile proceedings (*In re Joseph H.* (1979) 98 Cal.App.3d 627, 631-632 [159 Cal.Rptr. 681]). Pending legislative clarification, evidentiary insufficiency must be raised simply by appealing the order sustaining the petition's allegations.

ed he had no money. Ryles gestured with his gun toward an alley and said, "Let's go back there." At that moment Anderson grabbed for the gun, and the two struggled for about 10 seconds.

During the struggle Anderson was hit on the back of the head with a fist. The blow caused his glasses to be shaken loose. He did not see who hit him but knew that it was not Ryles and that the only other person present was the minor, who was in back of Anderson.

Anderson got possession of Ryles' gun and, as he did so, saw the minor running away. Ryles yelled, "Shoot him man; he's got my gun." Anderson then shot Ryles twice, within five seconds after being hit in the back of the head. Ryles died from the wounds.

The minor ran to 101st Street. There, outside a house less than half a block from the scene of the shooting, he met three individuals he knew and told each that Ryles had been shot. He also told one, Demetrius Hayes, that he had a gun in his mother's car and did not want to drive the car with the gun in it. He asked Demetrius to hide the gun for him.[2] The other individuals, Johnie Stigall and Enos Hayes, were questioned by police shortly after their conversation with the minor. They repeated what he had told them.

The minor stayed at Demetrius's house until about 5 o'clock in the morning. Demetrius hid the gun in his own car at about 6:30.

After the shooting, Anderson recounted the incident to the police and described one robber as wearing a dark beanie. Based on information obtained from Stigall and Enos Hayes, a mug-photo lineup was prepared; and Anderson was able to identify both the minor and Ryles.

At about 8 a.m. five officers went to the minor's home. They did not have an arrest warrant and had reason to believe he would be armed and dangerous. They searched the house and then asked his mother if they could search further. She said, "Go ahead, you'll do it anyway." After an officer explained that she could refuse to consent to the search she signed a consent form. The beanie was found on a closet shelf in the minor's bedroom. Inside it was a Taco Bell bag containing loose change and rolls of coins.

---

[2] The inference is that the gun the minor was talking about here was the one used in the Taco Bell robbery but not in the Anderson robbery.

At about 10 a.m. police arrested the minor at his high school. They recovered $115 from his pants pocket and $58 (in dollar bills) from his shirt pocket. At the station he waived *Miranda* rights and responded to questions with exculpatory statements and denials. The interrogating officer loudly accused him of lying and produced evidence against him —including the beanie, bag, and coins. He then confessed to participation in the two robberies, but not the homicide, and said his gun was in Demetrius' car. He now claims that, before confessing, he asked that the interrogation be terminated. (The unclear record on that issue is discussed below.)

That afternoon police went to Demetrius' house to search for the gun. Demetrius, 16 years old, was at school. The police asked his mother for permission to search his car. She consented but could not find the keys. His brother then broke. a car window, entered, and removed the back seats. Police entered and discovered the gun.

After the arrest the Taco Bell manager, Murray, was shown a lineup of 12 mug photos from which he identified the minor and Ryles as the robbers. He thought his identification was made on the day following the arrest.

## MURDER?

The murder allegation (Paragraph III) was based on the premise that the minor is liable for the death of his accomplice, Ryles, at the hands of the robbery victim, Anderson, under the doctrine pronounced in *People v. Washington* (1965) 62 Cal.2d 777 [44 Cal.Rptr. 442, 402 P.2d 130] and *People v. Gilbert* (1965) 63 Cal.2d 690 [47 Cal.Rptr. 909, 408 P.2d 365]. ▉ The minor argues that the evidence is insufficient to sustain a *Washington-Gilbert* murder finding, since it shows no life-threatening acts on his part other than those implicit in the crime of armed robbery. We agree.

*Washington* held that the felony-murder rule, which makes one guilty of first degree murder when he kills while committing or attempting a felony, is confined to homicide actually perpetrated by the felon or his accomplice. (62 Cal.2d at p. 783.) This court therefore reversed a murder conviction arising from a gas station robbery in which defendant's accomplice was killed by the station owner. The killing occurred when the accomplice entered the owner's office brandishing a pistol. The owner fired his own weapon immediately, mortally wounding the ac-

complice. Defendant, who had remained outside the office, was shot and wounded while escaping on foot with the robbery receipts.

*Washington* rejected felony-murder in such situations on grounds that, since the killing did not occur in the perpetration or attempted perpetration of a felony, necessary malice could not be ascribed on that basis to the surviving felon. (*Id.*, at p. 781.) The court concluded that the rule's purpose of deterring negligent or accidental deaths caused by felons would not be served by extending the rule to killings committed by their victims. Since any robbery victim may resist, extension of the felony-murder rule to such situations, the court reasoned, would punish arbitrarily those robbers whose victims by chance had responded lethally.[3]

*Washington* cautioned, however, that one may be a murderer when, with conscious disregard for life, he or his accomplice does an intentional act likely to cause death, even when the actual killing is accomplished by another. (*Id.*, at p. 782.) Thus, the court observed, defendants who initiate gun battles may be murderers of anyone killed in the crossfire. Yet by reversing defendant's conviction *Washington* implicitly concluded that mere participation in an armed robbery is not sufficient to invoke murder liability, direct or vicarious, when the victim resists and kills.[4]

That view subsequently was confirmed in *Gilbert, supra,* 63 Cal.2d 690. There, while defendant and his accomplice were escaping from the attempted robbery of a savings and loan office, defendant shot and killed Police Officer Davis. As the two fled, a second officer fired and mortally wounded the accomplice. At defendant's trial for the accomplice's murder the jury was instructed that defendant could be found guilty if the accomplice's death was a proximate result of the armed robbery. This court reversed, holding that the instruction had withdrawn from the jury the crucial issue whether the accomplice had been killed simply to prevent the robbery or because defendant had fired on

---

[3]The *Washington* majority rejected the argument that the felony-murder doctrine was intended to prevent robberies. "Neither the common-law rationale of the rule nor the Penal Code supports this contention. . . . An additional penalty for a homicide committed by the victim would deter robbery haphazardly at best." (*Ibid.*)

[4]Dissenting, Burke, J. contended that a felon is always guilty of murder when a victim or his defender kills in response to the crime. Malice, he argued, is established by the felony itself and the dangerous situation it creates. (*Id.*, at pp. 785-791.)

Officer Davis. The correct rule was stated to be as follows: "When the defendant or his accomplice, with a conscious disregard for life, intentionally commits an act that is likely to cause death, and his victim or a police officer kills in reasonable response to such act, the defendant is guilty of murder. *In such a case, the killing is attributable, not merely to the commission of a felony, but to the intentional act of the defendant or his accomplice committed with conscious disregard for life . . . .*" (P. 704, italics added.)

Thus *Gilbert* clearly held that resistance provoked only by the robbery itself is no basis for a finding of implied malice necessary for murder liability. Implicit in *Gilbert*, as in *Washington*, was the assumption that the life-threatening act on which that liability is premised must be something beyond the underlying felony itself and must be a proximate cause of death.

In *Taylor v. Superior Court* (1970) 3 Cal.3d 578 [91 Cal.Rptr. 275, 477 P.2d 131], this court again sought to determine what dangerous conduct would be sufficient to impose *Washington-Gilbert* murder liability. There defendant was charged with murder after one of his accomplices was killed in a liquor store robbery. Preliminary hearing evidence indicated that the accomplices, Smith and Daniels, entered the store (owned by Mr. and Mrs. West) for purposes of armed robbery while defendant waited outside in a getaway car. Daniels told Mr. West to "put the money in the bag" and then ordered him to lie on the floor or "we'll have an execution here." He "chattered insanely," repeatedly referring to Smith's gun and threatening to "blow [Mr. West's] head off" if West moved. Smith seemed "apprehensive" and acted as if "he was waiting for something big to happen." While Daniels was forcing Mr. West to the floor Mrs. West, standing on a nearby ladder, drew a pistol and fired fatal shots at Smith. Mr. West also seized a gun and shot at Smith. At the same time sparks were seen from Smith's gun, pointed in Mrs. West's direction; and a bullet later was dislodged from the wall behind where Mrs. West had been standing.

In an opinion joined by Chief Justice Wright and Justices McComb and Sullivan, Justice Burke affirmed denial of defendant's motion to dismiss. The opinion noted that the crucial test under *Washington* is "whether the *conduct* of a defendant or his accomplices was sufficiently provocative of lethal resistance to support a finding of implied malice . . . ." (*Id.*, at p. 583.) It conceded that resistance provoked solely by a robbery is insufficient to impose *Washington-Gilbert* murder li-

ability. The majority ruled, however, that a trier of fact could find sufficient "provocative conduct" in the robbers' threats of execution, their coercive approach to Mr. West (forcing him to lie on the floor), and their nervous and apprehensive manner that suggested the victims were in great danger. (P. 584.) Under those circumstances the trier of fact reasonably could conclude that Daniels and Smith had "initiated" a gun battle, though Mrs. West did fire first. (*Ibid.*)[5]

In vigorous dissents Justice Peters (joined by Justice Tobriner) and Justice Mosk argued that orders to hand over property under threats of violence are inherent in armed robbery. (See Pen. Code, §§ 211, 211a, 213.) By allowing a finding of implied malice merely because the robbers actually voiced the conditional threats already implicit in the underlying crime, said the dissenters, the *Taylor* majority had created an arbitrary liability and had obliterated the "additional conduct" limitation established in *Washington* and *Gilbert*. (Pp. 585-592 [dis. opn. of Peters, J.], 592-594 [dis. opn. of Mosk, J.].)[6]

Here the People argue that the minor's conduct in the Anderson robbery was as "provocative of lethal resistance" as that found sufficient for murder liability in *Taylor*. They rely in particular on (1) his part in moving Anderson away from relative safety at the lighted bus stop into the shadows of nearby buildings, (2) his repeated threats and references

---

[5]This court held more recently that *Washington-Gilbert* murder liability cannot be imposed for the "provocative conduct" of the accomplice who was killed. *People* v. *Antick* (1975) 15 Cal.3d 79 [123 Cal.Rptr. 475, 539 P.2d 43] reasoned that, since a deceased felon cannot be held liable for his own murder, his conduct causing the killing similarly cannot be the basis for vicarious liability of another person. (Pp. 88-90.) Thus, a burglary suspect was not liable for murder when his sole accomplice fired at arresting officers and was shot down by the police. *Antick* was deemed consistent with *Taylor* because the provocative conduct there relied on was primarily that of the surviving accomplice, Daniels. (P. 91.) The People concede here that the minor cannot be held vicariously liable for the conduct of his deceased accomplice, Ryles.

[6]We recently reemphasized that conduct *beyond* the original felony is required for "malicious conduct" murder liability. In *Pizano* v. *Superior Court* (1978) 21 Cal.3d 128 [145 Cal.Rptr. 524, 577 P.2d 659] a "shield" was killed by one attempting to prevent robbers' escape but unaware of the hostage's presence. We upheld murder charges against the robbers. We stated that *Gilbert* established "a guideline for determining whether the malicious conduct, *rather than the underlying felony, proximately caused* the victim's death." (P. 131, all but last two italics added.) When such "malicious conduct" produces death, we said, murder liability is not confined by *Gilbert's* suggestion that the death must occur as a "reasonable response" to the life-threatening acts. (Pp. 136-141; see *Gilbert, supra,* 63 Cal.2d at p. 704.) Thus, when a third party shoots and kills a robber's hostage, the robber is guilty of murder regardless of the motive behind the bullet.

to Ryles' pistol, and (3) his interference in the struggle between Ryles and Anderson. All these acts, the People urge, went beyond the underlying felony and were calculated to make Anderson fear for his safety and offer lethal resistance.

First, we reject the minor's blow to the back of Anderson's head during the struggle as a basis of his responsibility for Ryles' death. Anderson testified he had feared for his life from the moment the robbers displayed a gun and announced their intention. He decided to fight for the weapon and shoot Ryles when, after robbing him, Ryles suggested they move from the building shadows to an alley even darker. It was then, Anderson declared, that he knew he would be "executed" unless he fought for the gun. He stated that when he grabbed for the pistol he anticipated having to use it. Indeed, though the minor's subsequent blow dislodged his glasses, Anderson said it was not severe enough for him to "notice it."

That "rabbit punch" was certainly a malicious act taken in conscious disregard for life, since foreseeably it could have allowed Ryles to prevail and shoot Anderson, or at least caused the gun to discharge accidentally. However, it fails to meet the second requirement of *Washington-Gilbert-Pizano* murder liability since it did not provoke Anderson's lethal resistance and was not the proximate cause of Ryles' death. (See *Pizano* v. *Superior Court, supra*, 21 Cal.3d at p. 131; *Taylor* v. *Superior Court, supra*, 3 Cal.3d at p. 583.)

For their contrary view the People rely heavily on *In re Tyrone B.* (1976) 58 Cal.App.3d 884 [130 Cal.Rptr. 245] and *People v. Velasquez* (1975) 53 Cal.App.3d 547 [126 Cal.Rptr. 11]. Both are distinguishable. Each involved a deadly assault *initiated* in part by defendant, which predictably produced lethal resistance from the victim. (*Tyrone B., supra*, at p. 890 [unprovoked knife assault on robbery victim]; *Velasquez, supra*, at p. 554 [defendant initiated deadly battle by resisting arrest].) Neither opinion suggests that ineffectual blows struck after the victim has initiated a battle are a basis for murder liability.

We thus must decide whether, prior to commencement of the struggle between Ryles and Anderson, the minor committed intentional and malicious acts, in addition to the underlying robbery, that proximately caused Ryles' death. We conclude he did not. Before the struggle began he had done no more than participate actively in an armed robbery. His repeated admonitions to do what Ryles said or "he'll kill you" were di-

rected toward safe completion of the underlying felony. The warnings and commands were conditional and explicitly aimed at obtaining Anderson's property. Nothing he said or did suggested that Anderson was going to be killed whether he cooperated or not.[7] The minor simply voiced the threats already inherent in the dangerous felony. That alone is insufficient for a finding of *Washington-Gilbert* murder even when it helped provoke the victim's lethal response.

Nor did the minor's participation in moving Anderson from the bus stop into the shadows, a distance of less than 20 yards, constitute life-threatening conduct in addition to the underlying felony. All evidence indicates that this first movement was effected solely to lessen the risk that the robbery would be observed. Robbers do not become strictly liable for a killing by their victim simply because they encounter him at a spot too visible for their purposes and therefore move him a small distance in order to complete their robbery safely. To assess murder liability on this basis would cause guilt to depend arbitrarily on the fortuitous circumstances in which the robbery occurs.[8]

We recognize that Ryles' desire to move Anderson further into isolation, after the robbery had occurred, might suggest that Ryles had unconditional intent to kill. However, no statements or conduct of the minor indicated assent to that decision. It therefore does not form a basis for the minor's liability for Ryles' death.

Our conclusion can be reconciled with *Taylor, supra.* There the majority correctly stated that provocative conduct beyond that inhering in an armed robbery is necessary for *Washington-Gilbert* murder liability. It concluded that the particular facts there proved would support a finding of additional conduct because the robbers' demeanor suggested peculiar instability and a propensity for gratuitous violence. The record here yields no similar indication that the minor was prepared to kill whether or not Anderson complied with the robbers' demands. We therefore hold that the allegations of Paragraph III of the complaint cannot be sustained.

---

[7] Even if the minor's statements are placed in context of the entire situation the conclusion is the same. Ryles had threatened no unconditional killing at this time to which the minor, by his own remarks or conduct, could be deemed to have agreed.

[8] A holding that the movement here was conduct "in addition to" the felony would imply a rule that some armed robberies are sufficiently nondangerous to insulate the robbers from *Gilbert* liability when victims lethally respond, while others are not. The anomaly of such a doctrine seems apparent.

## SEIZURE OF TACO BELL BAG WITH COINS

The trial court denied the minor's motion to suppress the Taco Bell bag with coins that police found in the beanie on the closet shelf. He contends that illegal seizure of the items (1) invalidated their admissibility against him on the Taco Bell robbery charge, and (2) made his confession to both robberies inadmissible because confrontation with the items was used to induce his confession. (See *People* v. *Johnson* (1969) 70 Cal.2d 541, 545 [75 Cal.Rptr. 401, 450 P.2d 865, 43 A.L.R.3d 366].)

■ The court ruled that the seizure without warrant was validated by his mother's consent to the search of the house. He contends the evidence required a finding that her consent was coerced by fear and therefore ineffective.

She testified that five or six officers entered the house unannounced with drawn guns, conducted a search, and asked her to sign the written consent only after their search was virtually complete. She stated she signed because she was afraid. An officer, however, testified that he was one of five who went to the house to arrest the minor, whom they believed to be armed and dangerous. Two went to the rear to prevent an escape. The others knocked on the front door; the mother answered; and they announced their purpose, entered, and went through the house looking for the minor. They obtained her written consent only after explaining her right to refuse and before searching for evidence. Accepting that officer's testimony, the trial court properly found the consent to be voluntary. (*People* v. *James* (1977) 19 Cal.3d 99 [137 Cal.Rptr. 447, 561 P.2d 1135].)

■ By supplemental brief filed after we granted a hearing, the minor's attorney for the first time argues that the mother's consent was vitiated by illegality of the police entry. (See *Burrows* v. *Superior Court* (1974) 13 Cal.3d 238, 251 [118 Cal.Rptr. 166, 529 P.2d 590] [consent immediately following illegal entry is not voluntary].) Illegality is claimed on two grounds.

The first is noncompliance with Penal Code section 844, which permits an officer to make a forced entry for an arrest only "after having demanded admittance and explained the purpose for which admittance is desired." The statute requires entering officers to identify themselves as such. (*Greven* v. *Superior Court* (1969) 71 Cal.2d 287, 291-293 [78

Cal.Rptr. 504, 455 P.2d 432].) Only two of the five who went to the house here were in uniform. They might have been the ones who watched the back door; in that case the ones who entered were in plain clothes. When the mother answered the door an officer said, "We're here to arrest Joe" or "We're looking for your son, Joe." The officers then entered. Though the mother testified they entered unannounced, she did not claim any doubt when she first saw them that they were officers. The statute's self-identification requirement thus seems satisfied.

■ The other ground asserted for illegality of the entry is lack of an arrest warrant. *People* v. *Ramey* (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d 1333] (filed more than three months prior to the events here in question) held that a warrantless arrest in defendant's home is illegal in the absence of exigent circumstances. Such circumstances have been found where the arrest was in continuous fresh pursuit (*People* v. *Escudero* (1979) 23 Cal.3d 800, 808-811 [153 Cal.Rptr. 825, 592 P.2d 312] (one-hour pursuit)), or the suspect probably was armed and likely to escape (*People* v. *Frierson* (1979) 25 Cal.3d 142, 168-169 [158 Cal.Rptr. 281, 599 P.2d 587]), or a major emergency in early morning hours severely taxed police facilities (*Cleaver* v. *Superior Court* (1979) 24 Cal.3d 297, 306-307 [155 Cal.Rptr. 559, 594 P.2d 984]).

The investigating officer said he was first called about the case at 2 a.m. at his home. He went to the scene of the killing, where he spent an hour to an hour and a half. He returned to the station and interviewed seven to nine possible witnesses. The last interview was with the robbery victim, Anderson, and took at least an hour. The police arrived at the minor's home about 8 a.m. to arrest him.

Though that evidence alone appears insufficient to establish exigent circumstances justifying a warrantless arrest at 8 a.m., we do not know what additional showing of exigency might have been made if illegality of the entry had been asserted in the trial court as a ground for attacking the validity of the mother's consent to the search. Accordingly, we do not now consider the claimed illegality as basis for reversal on appeal. (*People* v. *Kizzee* (1979) 94 Cal.App.3d 927, 934 [156 Cal.Rptr. 784], and cases cited.)

■ The minor further contends that his mother's consent did not authorize the seizure of the Taco Bell bag and rolls of pennies, empty roll-wrapper, and loose change inside the bag. He concedes that she could properly consent to search of the bedroom he shared with a youn-

ger brother and of the closet, which police entered without opening any door. (See *In re Scott K.* (1979) 24 Cal.3d 395, 404 [155 Cal.Rptr. 671, 595 P.2d 105]; *United States* v. *Matlock* (1974) 415 U.S. 164 [39 L.Ed.2d 242, 94 S.Ct. 988]; *People* v. *Daniels* (1971) 16 Cal.App.3d 36 [93 Cal.Rptr. 628].) He argues, however, that the police had no right to open the bag, invoking *Scott K., supra,* where we held that a father's consent did not justify search of his minor son's locked toolbox.

The court ruled here that his mother's consent did justify search of his personal property, including the bag and other items. If made today that ruling arguably might conflict with *Scott K.* The ruling was made, though, in August 1976, upholding a search that occurred the preceding June; and *Scott K.* was not filed until May 25, 1979.

Should *Scott K.* be applied retroactively? The principles are stated in *People* v. *Kaanehe* (1977) 19 Cal.3d 1, 10 [136 Cal.Rptr. 409, 559 P.2d 1028], as follows: "Whether a judicial decision establishing new constitutional standards is to be given retroactive effect is customarily determined by weighing the following factors: '(a) the purpose to be served by the new standards, (b) the extent of reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of retroactive application of the new standards.' (*Stovall* v. *Denno* (1967) 388 U.S. 293, 297 [18 L.Ed.2d 1199, 1203, 87 S.Ct. 1967]; accord, *In re Johnson* (1970) 3 Cal.3d 404, 410 [90 Cal.Rptr. 569, 475 P.2d 841].) 'It is also clear that the factors of reliance and burden on the administration of justice are of significant relevance only when the question of retroactivity is a close one after the purpose of the new rule is considered.' (*In re Johnson, supra,* 3 Cal.3d 404, 410.) Decisions have generally been made fully retroactive only where the right vindicated is one which is essential to the integrity of the fact-finding process. On the other hand, retroactivity is not customarily required when the interest to be vindicated is one which is merely collateral to a fair determination of guilt or innocence. (*In re Johnson, supra,* 3 Cal.3d 404, 410-413 and cases cited therein.) *Burrows* [v. *Superior Court, supra,* 13 Cal.3d 238] clearly falls within the latter category. Exclusion is not necessary to ensure the reliability of the fact-finding process at trial. No compulsion is present and the evidence seized is entirely trustworthy. *As the purpose of the exclusionary rule in those circumstances is to deter illegal conduct by law enforcement officials,* exclusion of evidence seized prior to the pronouncement of a decision does not further compliance with that decision. (*Id.*)" (Italics added; fn. omitted.) See too *In re Lopez* (1965) 62 Cal.3d 368 [42 Cal.

Rptr. 188, 398 P.2d 380]; *People* v. *Superior Court (Harris)* 100 Cal. App.3d 386 [160 Cal.Rptr. 880] (hg. den. Feb. 20, 1980).)

Those principles apply here. *Scott K.* announced a rule that, even if not new, had before its announcement been far from clear. The rule's aim was not to protect the integrity of the factfinding process but to deter invasion of minors' property and privacy rights. Accordingly, the rule does not apply retroactively.

### SEIZURE OF GUN FROM DEMETRIUS' CAR

The minor complains of the court's denial of his motion to suppress the gun seized by police while searching the car of Demetrius Hayes, a minor, with the consent of Demetrius' mother. She did not say it was Demetrius' car, and the police did not ask. The court denied suppression, holding her consent effective. In light of *Scott K.*'s nonretroactivity that denial need not be disturbed.

### ADMISSIBILITY OF CONFESSION

The investigating officer testified to the substance of the minor's confession to participation in the robberies. That testimony and a tape that recorded the confession were admitted after denial of a motion to suppress. Thereafter the minor, in an effort to refute the murder charge, testified to his participation in the robberies.

■ Improper introduction of a confession constitutes reversible error. (*People* v. *Braeseke* (1979) 25 Cal.3d 691, 704 [159 Cal.Rptr. 684, 602 P.2d 384], and cases cited.) The Attorney General mistakenly relies on *People* v. *Enriquez* (1977) 19 Cal.3d 221, 239 [137 Cal.Rptr. 171, 561 P.2d 261], for a rule that the error may be deemed harmless beyond a reasonable doubt. *Enriquez* involved an admission, not a confession, and thus is not controlling. The distinction is made clear in *People* v. *McClary* (1977) 20 Cal.3d 218, 230 [142 Cal.Rptr. 163, 571 P.2d 620].

■, ■ Three grounds are advanced for excluding the confession. One is that it was made in response to confrontation with the seized cap, bag, and coins. Since we regard the seizure as legal that ground need not be considered. The other grounds are that the confession was (1) coerced by threats, and (2) elicited after a request that the interrogation cease.

The content of the officers' interrogation of the minor was presented in three ways: (1) by playing the tape recording, which the court deemed largely unintelligible, (2) by an officer's testimony, and (3) by counsel's unsworn statements as to their own notes and recollections from listening to the tape. The officer's testimony was pertinent to the present claim only with respect to allegedly coercive threats; it did not touch the issue of whether the minor asked for termination of the interview.

At the outset of the interview the minor received adequate *Miranda* warnings. The officer testified: For the first 30 or 40 minutes the minor denied guilt and gave exculpatory answers. He then was accused by the police loudly, emphatically, and with terse language (e.g., "bullshit") of lying about his whereabouts during the previous 24 hours and how he had acquired the currency found in his possession. Next he was told about the cap, bag, and coins found in his home. After that he confessed.

Subsequently in oral argument on the motion to suppress, defense counsel stated:

"Now, I recognize that the tape reflects the police officer giving this young man his *Miranda* rights. That, however, does not end the discussion...

"At one point, during the confession, Joe says to the police officers, 'That's all I have to say.' And I believe this is after the point at which Sergeant Iorio, the person who was primarily interrogating Joe, ran down, if the Court will, a 'parade of horribles' that they had found, tending to show that that young man was involved in a homicide. After that, the question was—let me see if I can get it from my notes. I believe that the question was 'Is that all you want to tell us?' And Joe's response was 'that's all I want to tell you.'

"Now, that is before the second portion of the interview, to which we have referred, in which he gave an indication that he would talk to the police officers and did give the facts that inculpated him in the homicide and in the robberies."

The argument continued:

"THE COURT: Let me just ask you, Counsel, because this is one point in the conversation that I was just not able to understand. What is the next thing that was said by either party after Joe said, 'That's all I want to tell you'? Do either of your notes indicate that?

"[DEFENSE COUNSEL]: Well, the next thing in my notes is that one of the officers said to Joe, 'Joe, there's something you might not know about the law,' and then gave him his interpretation, I take it, of the felony-murder rule. That's the last thing I have in my notes. Perhaps, Counsel has something else.

"THE COURT: I did hear some reference to that. I assumed they were talking about the felony-murder rule, but is it your understanding that that's the very next thing that occurred after?

"[DEFENSE COUNSEL]: To be honest, I don't have a specific recollection of it and it's the next thing I see in my notes. I think it was, and it would make sense, in terms of what happened there. . . ."

The prosecutor gave a slightly different version: "THE COURT: What comments do you have to make with regard to Joe's statement 'That's all I want to tell you'?

"[PROSECUTOR]: First of all, I don't think that was his statement. The statement he made was, I think, as my notes indicate, 'That's all I got to say,' which is a little bit different, and that was in the context of asserting, I think, his previous denials. He had been challenged by Sergeant Iorio with respect to the veracity of his previous statements. Investigator Iorio had paraded to him a series of things that had disputed his various denials.

"THE COURT: Let me just pinpoint it. I think the issue, at this point, is does the minor—not is the minor—explaining to the police officers that he wants the interrogation to cease? I think that's the factual issue squarely in point and how you construe that statement.

"[PROSECUTOR]: Well, the way I think the Court should construe that statement is that in the face of Sergeant Iorio's accusations, that what he was saying was a lie, not the truth; he was just reasserting 'that's all I have got to say;' namely, 'that's my story. I'm going to stick with it.'"

The facts stated in the officer's testimony and the attorneys' arguments offer no basis for setting aside the finding that the confession was voluntary. "[M]ere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary." (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 611 [147 Cal.Rptr. 172, 580 P.2d 672].) The confession here was not invalidated by "express or implied promises of leniency" (*People* v. *McClary, supra,* 20 Cal.3d 218, 228) or by "deception . . . of a type reasonably likely to procure an untrue statement" (*In re Walker* (1974) 10 Cal.3d 764, 777 [112 Cal.Rptr. 177, 518 P.2d 1129]).[9] The court had no duty to rule that loud, aggressive accusations of lying amounted to coercive threats. As the judge noted, the minor was then nearly 18 years old.

A more perplexing question is raised by the claim that the interrogation was illegally continued after defendant asked for its termination. On that issue the court ruled: "I do not find that the language used, when defendant said, 'That's all I have got to say,' or 'That's all I want to say,' as asserting his privilege against self-incrimination considered in its context, the point in the conversation in which it occurred and what followed afterwards."

If at any time the minor indicated in any manner that he did not wish to talk further, the police were required to cease questioning him; and any admission or confession obtained from further interrogation would have been inadmissible. (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 473-474 [16 L.Ed.2d 694, 722-724, 86 S.Ct. 1602, 10 A.L.R.3d 974]; *People* v. *Superior Court (Keithley)* (1975) 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585].) A desire to halt the interrogation may be indicated in a variety of ways. (See *People* v. *Pettingill* (1978) 21 Cal.3d 231, 238-241 [145 Cal.Rptr. 861, 578 P.2d 108], reviewing decisions beginning with *People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625].) Yet the words here must be construed in context. Thus in *People* v. *Carr* (1972) 8 Cal.3d 287, 297 [104 Cal. Rptr. 705, 502 P.2d 513], the officer asked defendant, "Would you like to quit now, Mr. Carr?" to which defendant nodded affirmatively. This court commented that "the evidence that the defendant was reasserting his *Miranda* rights is highly equivocal. In fact, taking into account the

[9]Even if the interrogators gave the minor an unintentionally inaccurate interpretation of the felony-murder rule, it was not deceptive to warn him that he might face some sort of murder charge arising out of Ryles' death during the robbery of Anderson.

circumstances surrounding the alleged request to discontinue questioning, Lieutenant Spinale was probably asking the defendant if he was ready to end the interview as the lieutenant felt that there was little else to talk about and that is how the defendant took the statement." (P. 297.)

Here the record seems to support the court's conclusion that defendant did not seek to halt the interview. There is no material variance in each side's version of the words used. According to defense counsel the minor said, "That's all I have to say" immediately after the officer confronted him with adverse evidence. Also at that point the officer asked, "Is that all you want to tell us?"; and defendant replied, "That's all I want to tell you." According to the prosecutor defendant said, "That's all I got to say" after the officer challenged his veracity and "paraded to him a series of things that had disputed his various denials." It was not unreasonable for the court to endorse the prosecutor's inference that what defendant was saying was, That's my story, and I'll stick with it.

■ The court's ruling was made before *People* v. *Jimenez, supra*, 21 Cal.3d 595, 608-609, held that (1) the prosecution has the burden of proving voluntariness of a confession beyond a reasonable doubt, (2) it cannot be presumed that trial courts applied the correct standard in pre-*Jimenez* rulings, and (3) we should uphold prior rulings of voluntariness only if there is no reasonable probability that a result more favorable to defendant would have been reached had the correct standard been applied.[10] Here the material facts are hardly disputed, and it seems not probable that application of the requirement for proof of voluntariness beyond a reasonable doubt would have changed the result.

The order declaring the minor to be a ward of the juvenile court is reversed insofar as it sustains the allegations charging murder. In other respects it is affirmed. The order committing the minor to the Youth Authority is reversed, and the case is remanded for further proceedings consistent with this opinion.

Bird, C. J., Tobriner, J., and Mosk, J., concurred.

---

[10]*Jimenez* dealt with involuntariness arising from promises of leniency. The same principles apply to questions whether a confession was obtained in violation of *Miranda* rights. (See *People* v. *Ramirez* (1979) 91 Cal.App.3d 132, 140 fn. 13 [153 Cal.Rptr. 789].)

**CLARK, J.**—I dissent from the majority opinion insofar as it absolves defendant of vicarious responsibility for the murder of his accomplice. I further dissent insofar as the majority reaffirm, while denying retroactive effect to, this court's unfortunate decision in *In re Scott K.* (1979) 24 Cal.3d 395 [155 Cal.Rptr. 671, 595 P.2d 105].

Defendant struck Mr. Anderson on the back of the head as Anderson struggled with Ryles for the pistol. This malicious conduct, I conclude, was a proximate cause of Ryles' death. The majority reject this conclusion on the ground Anderson had already decided, before defendant struck him, to use the gun if he gained control of it.[1] This is a fair reading of the record. However, it ignores certain obvious, if unspoken, facts.

Anderson disarmed Ryles and shot him with his own pistol. Had Anderson believed defendant was no threat to him, that defendant would not come to Ryles' assistance, Anderson might well have not shot Ryles but rather simply held him at gunpoint until the police arrived. However, defendant had come to Ryles' assistance seconds before when Anderson was struggling with him for the pistol. Therefore, when Ryles shouted to defendant, "Shoot him, man; he's got my gun," Anderson could reasonably conclude defendant would do so and that he (Anderson) had to shoot Ryles to protect himself from the two assailants.[2]

Admittedly, Anderson did not testify that he engaged in the analysis suggested. However, he was required to react instantaneously to a com-

---

[1]"[W]e reject the minor's blow to the back of Anderson's head during the struggle as a basis of his responsibility for Ryles' death. Anderson testified he had feared for his life from the moment the robbers displayed a gun and announced their intention. He decided to fight for the weapon and shoot Ryles when, after robbing him, Ryles suggested they move from the building shadows to an alley even darker. It was then, Anderson declared, that he knew he would be 'executed' unless he fought for the gun. He stated that when he grabbed for the pistol he anticipated having to use it. Indeed, though the minor's subsequent blow dislodged his glasses, Anderson said it was not severe enough for him to 'notice it.' [¶] That 'rabbit punch' was certainly a malicious act taken in conscious disregard for life, since foreseeably it could have allowed Ryles to prevail and shoot Anderson, or at least caused the gun to discharge accidentally. However, it fails to meet the second requirement of *Washington-Gilbert-Pizano* murder liability since it did not provoke Anderson's lethal resistance and was not the proximate cause of Ryles' death." (*Ante*, pp. 507-508.)

[2]Although defendant had personally used a pistol in robbing the fast food stand minutes earlier, he did not brandish a weapon during the Anderson robbery. Nevertheless, Anderson could reasonably conclude that, unless defendant were armed, Ryles would not have shouted to him, "Shoot him, man; he's got my gun."

plex situation of which defendant's malicious conduct was a significant element. That Anderson may not have consciously assessed the significance of defendant's conduct or may not recall having done so does not mean it did not play a crucial role in his shooting of Ryles. In situations of this sort we should not focus exclusively on the victim's recall of his subjective response to the defendant's malicious conduct. Rather, we should also consider whether a reasonable man, given the opportunity and presence of mind to assess the significance of the defendant's conduct, would have been provoked to lethal resistance by it. Applying this standard I conclude defendant was vicariously responsible for the murder of his accomplice.

The orders declaring defendant a ward of the juvenile court and committing him to the Youth Authority should be affirmed without modification.

Richardson, J., concurred.

**MANUEL, J.,** Dissenting—For the reasons expressed in that part of the dissenting opinion of Justice Clark concluding that the defendant is responsible for the murder of his accomplice, I respectfully dissent from the judgment of this court reversing the judgment of the juvenile court.