Filed 3/18/14  P. v. Lewis CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056322 |
| v. | (Super.Ct.No. FBA900631) |
| RICARDO MILTON LEWIS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Douglas M. Elwell, Judge.  Affirmed in part; reversed in part.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Steve Oetting and Michael Pulos, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

Defendant Ricardo Milton Lewis appeals from his conviction of second degree murder (Pen. Code,[1] § 187, subd. (a), count 1) and attempted first degree robbery (§§ 664, 211, count 2) with true findings on allegations of four strike priors (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and three prison priors (§ 667.5, subd. (b).)

Defendant contends: (1) the trial court erred in denying his request to represent himself; (2) the evidence was insufficient to support his murder conviction under the provocative act doctrine; (3) the trial court erred in its instruction to the jury on the definition of a provocative act; and (4) the trial court erred in instructing the jury on the proximate cause element. We agree that instructional error requires reversal of defendant's murder conviction.

## II. FACTS AND PROCEDURAL BACKGROUND

In the afternoon of June 12, 2009, Donald Throenle saw three men in a white Suburban drive back and forth about four times in front of the house of his neighbor, Paul Arreola, on Teton Drive in Barstow. Throenle telephoned Arreola to report what he had seen. About three hours later, just before dark, Throenle saw the same vehicle "stopped at the top of the street."

Arreola testified under a grant of use immunity. He had already pled guilty to a felony charge of maintaining a place where drugs are sold or used, and he was awaiting

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

2

sentencing. He expected to be placed on felony probation and ordered to serve 180 days in jail.

Arreola testified that he arrived home at about 8:00 p.m. on June 12, 2009. At about 9:30 p.m., the lights in his house suddenly went out. He remembered what Throenle had told him about the car driving by earlier. He put his handgun in his waistband and waited a few minutes to see if anyone would break in. When nothing happened, he looked out and saw that his neighbor's lights were on, so he went outside to check his electrical box.

As he walked around the front of the house, a man, later identified as Henry Jackson, grabbed Arreola in a bear hug but did not say anything. Arreola tried to get away and yelled to his neighbor for help. He thought he could get away or that his neighbor would come help him; he did not then believe it was a life and death struggle.

However, two other men, later identified as defendant and Stefan Copeland,[2] ran over and also grabbed Arreola. Arreola struggled with the men, none of whom said anything. Jackson tried to cover Arreola's mouth while defendant and Copeland tried to grab Arreola's legs as if to pick him up. When all three men were struggling with him, Arreola "began to get scared." He "figured [he] better do something besides yell or try to run away." Arreola thought the men were trying to drag him into the house, and that "if [he] did get taken back in the house that [he] would either be stabbed or tortured or something that wouldn't be right." Arreola intentionally fell down while Jackson had his

_____

[2] Copeland was also charged with murder and attempted robbery. He was tried separately.

3

arm around Arreola's neck. The assailants still remained silent. While on the ground, Arreola pulled out his gun and shot Jackson. Defendant and Copeland fled.

Arreola called a family member and then called 911. When the police arrived at about 10:00 p.m., Jackson was lying face down; his pulse was faint, and he was not breathing. He was pronounced dead a short time later. The cause of death was a gunshot wound to the pelvis that tore a blood vessel.

Defendant's wallet was found at the scene. The officers also discovered full-grown marijuana plants, marijuana seedlings, grow lamps, and individually packaged baggies of marijuana in Arreola's house. Arreola testified he sold marijuana to about 10 family members and friends; he had known Copeland since 1993; and he had once given Copeland some marijuana. Arreola suffered bruises and scratches during the incident. The police observed that all the individual fuse breakers in Arreola's electrical panel had been flipped to the "off" position.

Dennis Pitman, an inmate at the county jail on charges of possession of methamphetamine for sale, testified under a grant of use immunity. Pitman had prior convictions for robbery and theft. He did not expect to receive any kind of break in his current case.

Pitman testified that he, defendant, and Copeland had been in a holding tank at the courthouse on December 16, 2011. He had never met defendant or Copeland before. Defendant asked Pitman about how to get paperwork for his case and asked what Pitman thought about his situation. Pitman said he would need to know more about the circumstances. Defendant said that he, Copeland, and "the dead man" went to Barstow to

4

rob a man of drugs. Neither defendant nor Jackson knew the intended victim, and defendant had not known Copeland before that day. None of them had a gun, and they did not think the intended victim had a gun.

Defendant told Pitman that he, Copeland, and Jackson communicated by walkie-talkie. They started fighting with Arreola, intending to steal his drugs, when Arreola took out his gun and shot Jackson. Defendant ran back to the vehicle. He and Copeland repeated to each other that the victim was not supposed to have a gun.

The morning of Pitman's testimony, defendant said to Pitman in the hallway going to holding cells that he was going to stop Pitman and told Pitman, "You can't live in Barstow, you'll die."

The jury found defendant guilty of second degree murder (§ 187, subd. (a), count 1) and attempted first degree robbery (§§ 664, 211, count 2). The trial court found true allegations of four strike priors (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and three prison priors (§ 667.5, subd. (b).) The trial court sentenced defendant to a total sentence of 48 years to life.

Additional facts are set forth in the discussion of the issues to which they pertain.

## III. DISCUSSION

### A. Denial of Request for Self-Representation

Defendant contends the trial court erred in denying his request to represent himself.

*1. Additional Background*

On February 8, 2012, defendant brought a motion characterized as a *Faretta*[3] motion. The trial court inquired of defendant, "[D]o you, in fact, wish to represent yourself in this case?" Defendant responded, "I, in fact, wish to go co-counsel, if it's possible." The court stated it was not possible, and again asked defendant if he wished to represent himself. Defendant repeated that he wished to "go co-counsel." The trial court thereupon denied the motion.

On February 22, 2012, after rejecting the People's plea offer of a three-year sentence for voluntary manslaughter, defendant brought a motion under *People v. Marsden* (1970) 2 Cal.3d 118 to discharge his appointed counsel. The trial court denied the motion.

On February 29, 2012, just before jury selection was to begin, defendant told the court that at the prior *Faretta* hearing, he did not understand that he could not "go co-counsel." The trial court stated: "Well, hang on just a minute before we go any further, because we had a separate hearing, as you will recall, the week before that which you had asked for a *Faretta*. And we inquired here in open court. And I said, [d]o you want to represent yourself. You said, No, I want co-counsel. I said I do not appoint co-counsel, nor am I obligated to, and that I'm not going to do that. So I asked you again the question under *Faretta*. Is—do you want to represent yourself. And you said, No, I do not, I want co-counsel. I said I would—."

---

[3]  From *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

Defendant interjected, "I didn't understand that then, which I understand right now." The trial court replied, "Well, I don't know what is difficult to understand about the word 'no.' You asked for co-counsel I said I'm not giving you one."

Defendant asked, "Your Honor, isn't it my Constitutional right to go pro[.] per[.]?" The trial court replied: "It is." Defendant continued, "At [any] time during the proceedings." The trial court stated, "No. It is a qualified right only. Okay. And it is not true that it can be at any time. Okay. And your having asked for co-counsel before, and having that been decided, and that this being the day of trial, okay, and having a jury outside the courtroom ready to be brought in, I'm inclined to find, because I know [trial counsel] is prepared to present this case, and by having turned down a *Marsden* before because you did not establish an adequate basis for that, I'm inclined to find that your *Faretta* motion is untimely, which is a ruling I can make." The trial court added, "I'm prepared to go forward in this particular case. Now please understand, [defendant], I have found and do find that your attempts to represent yourself at this very last minute, particularly given the history of your machinations previously, strikes the Court—and I'm convinced of this, strikes the Court as nothing more than an attempt to delay and to obfuscate and interfere with the progress of this case." The trial court ruled the request was untimely. In continued discussions, the trial court stated that "even if I were to have granted your *Faretta*, which I find to be not a true *Faretta* but an untimely effort to delay the trial," the court would have continued defense counsel as standby counsel. Defendant continued to request replacement of counsel, and the court stated, "[Y]our efforts to claim *Faretta* were inadequate and untimely and, frankly, unbelievable . . . ."

7

*2. Analysis*

The Sixth Amendment grants a criminal defendant the right to conduct his own defense if he has knowingly and intelligently waived his right to counsel. (*Faretta*, *supra*, 422 U.S. at pp. 835-836.) To invoke that right, the defendant "must make an unequivocal assertion of that right within a reasonable time prior to the commencement of trial." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1365.) "This rule 'is necessary in order to protect the courts against clever defendants who attempt to build reversible error into the record by making an equivocal request for self-representation.' [Citation.]" (*People v. Roldan* (2005) 35 Cal.4th 646, 683, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "'The court faced with a motion for self-representation should evaluate not only whether the defendant has stated the motion clearly, but also the defendant's conduct and other words. Because the court should draw every reasonable inference against waiver of the right to counsel, the defendant's conduct or words reflecting ambivalence about self-representation may support the court's decision to deny the defendant's motion.'" (*People v. Valdez* (2004) 32 Cal.4th 73, 98 (*Valdez*).)[4]

In *People v. Marlow* (2004) 34 Cal.4th 131, the Supreme Court deemed a defendant's inquiry similar to that made in the instant case as a request for information, not an unequivocal assertion of the right to self-representation. Specifically, the

---

[4] The People argue at some length that defendant's subsequent disruptive conduct during his trial justified the denial of his motion for self-representation. However, we review the trial court's ruling on the basis of the record before it at the time the ruling was made. (E.g. *People v. Cervantes* (2004) 118 Cal.App.4th 162, 176.)

8

defendant in that case inquired, "'Is it possible that I just go pro[.] per[.] in my own defense and have someone appointed as co-counsel?'" (*Id.* at p. 147.) The court held that the defendant's question "was a request for information, not a *Faretta* motion," and that "the trial court went on to 'decline to do that at this particular time' did not convert defendant's inquiry into a motion." (*Ibid.*; fn. omitted.) In *People v. Danks* (2004) 32 Cal.4th 269, the defendant stated, following at lengthy discussion at a *Marsden* motion, "'I want a trial. *I want to defend myself and go pro. per. If I'm not allowed to go pro. per.*, I would at least like to be cocounsel to where I could sit there, maybe I could just take the stand and tell 'em, the jury exactly what happened on this incident.'" (*Danks*, *supra*, at p. 295.) The court held that, in the context in which they were made, the defendant's "references to self-representation were equivocal, born primarily of frustration regarding the granting of counsel's requests for continuances and his desire to avoid further psychiatric examination." (*Id.* at p. 296; see also p. 297.)

In this case, defendant's remarks in the trial court were just as equivocal as those rejected as insufficient invocations of the right to self-representation in the above cases. Because defendant failed to make an unequivocal request for self-representation, there was no error.

Defendant contends that because the trial court treated the inquiry as a request for self-representation, we should address the issue on the merits. However, in *People v. Marshall* (1997) 15 Cal.4th 1, the court held that a defendant's statements "d[id] not constitute an unequivocal invocation of the right of self-representation simply because the trial court described the motion as one for self-representation . . . ." (*Id.* at p. 25.)

9

Similarly, in *Valdez*, the court rejected the defendant's argument that the trial court had recognized his inquiry as a *Faretta* motion. The court explained: "Even if the court did treat [the] defendant's statement as an assertion of his right to represent himself, we are not bound by such a determination. 'A reviewing court, in determining whether a motion for self-representation is unequivocal, is not bound by the trial court's apparent understanding that the defendant was making a motion for self-representation.' [Citation.]" (*Valdez*, *supra*, 32 Cal.4th at p. 99.)

## B. Sufficiency of Evidence

Defendant contends the evidence was insufficient to support his murder conviction under the provocative act doctrine.

### 1. Standard of Review

When we review the sufficiency of the evidence to support a conviction, we examine "'the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129, disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

### 2. Analysis

Under the provocative act doctrine, murder liability is imposed when the defendant or an accomplice provokes a third party to kill another victim. In other words, "When someone other than the defendant or an accomplice kills during the commission or attempted commission of a crime, the defendant is not liable under felony-murder

10

principles but may nevertheless be prosecuted for murder under the *provocative act*

doctrine." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 654 (*Gonzalez*).)  Under that

doctrine, "when the perpetrator of a crime maliciously commits an act that is likely to

result in death, and the victim kills in reasonable response to that act, the perpetrator is

guilty of murder.  [Citation.]" (*Id.* at p. 655.)  "'In such a case, the killing is attributable,

not merely to the commission of a felony, but to the intentional act of the defendant or his

accomplice committed with conscious disregard for life.' [Citation.]" (*Ibid.*; fn.

omitted.)  "A provocative act is one that goes beyond what is necessary to accomplish an

underlying crime and is dangerous to human life because it is highly probable to provoke

a deadly response." (*Ibid.*)

In *Gonzalez,* the court explained that "read in context, the phrase 'life-threatening

act' is essentially a shorthand definition that restates the proximate cause element of

provocative act murder.  We have used the phrase, for example, in summarizing [a prior]

holding that provocative act murder requires an intentional act that is beyond what is

necessary to commit the underlying felony and that provokes a lethal response from the

victim or police officer.  [Citations.]  A provocative act is conduct that is dangerous to

human life, not necessarily in and of itself, but because, in the circumstances, it is likely

to elicit a deadly response.  The danger addressed by the provocative act doctrine is not

measured by the violence of the defendant's conduct alone, but also by the likelihood of a

violent response.  Thus, our cases have not required any particular level of violence to

support provocative act murder liability." (*Gonzalez*, *supra*, 54 Cal.4th at p. 657.)

11

In *People v. Kainzrants* (1996) 45 Cal.App.4th 1068 (*Kainzrants*), for example, the court held that the jury could reasonably find that defendant "committed a life-threatening act beyond the underlying robbery" when the defendant pointed a submachine gun at the head of the fiancée of the intended robbery victim, Bell, and threatened to shoot the fiancée if Bell would not come out of the house.  Bell started shooting, and one of his bullets killed his fiancée.  (*Id.* at pp. 1072-1073, 1077.)  On those facts, the court upheld the defendant's conviction for provocative act murder.  (*Id.* at p. 1079.)

In *Taylor v. Superior Court* (1970) 3 Cal.3d 578, overruled on another ground in *People v. Antick* (1975) 15 Cal.3d 79, 92, fn. 12, the court held the defendant's accomplice committed an act "sufficiently provocative of lethal resistance to support a finding of implied malice" (*Taylor v. Superior Court*, *supra*, at pp. 583, 584) when he "'chattered insanely'" during a liquor store robbery and said, among other things, "'Don't move or we'll have an execution right here,'" leading the liquor store proprietor to draw a weapon and shoot a second accomplice.  (*Id.* at p. 581.)  The Supreme Court later cited the case with approval, stating that the *Taylor* court had "concluded that the particular facts there proved would support a finding of additional conduct [beyond that inherent in an armed robbery] because the robbers' demeanor suggested peculiar instability and a propensity for gratuitous violence."  (*In re Joe R.* (1980) 27 Cal.3d 496, 508 (*Joe R.*).)

In contrast, in *Joe R.*, *supra*, 27 Cal.3d 496, our Supreme Court held that the evidence was insufficient to establish provocative act murder.  The defendant and his accomplice, Ryles, had the victim walk behind nearby buildings and then robbed him.

12

The defendant warned the victim that Ryles would kill him if he did not obey. Ryles then tried to get the victim to go into an alley, and the victim, fearing for his life, grabbed for the gun and began struggling with Ryles. During the struggle, the defendant struck the victim with his fist on the back of the head before the victim gained possession of the gun and shot Ryles while the defendant was running away. (*Id.* at p. 507.) The court first concluded that the defendant's blow to the victim's head during the struggle "did not provoke [the victim's] lethal resistance and was not the proximate cause of Ryles' death." (*Ibid.*) The court further held that none of the defendant's acts proximately caused Ryles's death. His admonitions to the victim to comply with Ryles "were directed toward safe completion of the underlying felony," and "[n]othing he said or did suggested that [the victim] was going to be killed whether he cooperated or not." (*Id.* at pp. 507-508, fn. omitted.) Finally, the court also held that moving the victim about 20 yards from a bus stop into the shadows did not "constitute life-threatening conduct in addition to the underlying felony. All evidence indicate[d] that this first movement was effected solely to lessen the risk that the robbery would be observed. Robbers do not become strictly liable for a killing by their victim simply because they encounter him at a spot too visible for their purposes and therefore move him a small distance in order to complete their robbery safely." (*Id.* at p. 508.) The court stated that even if Ryles intended to kill the victim after moving him into the alley, "no statements or conduct of the minor indicated assent to that decision." (*Ibid.*)

The present case is more like *Taylor* and *Kainzrants* than like *Joe R.* Defendant and/or his confederates cut off the electricity to Arreola's home, thereby luring him

13

outside the house to check the fuse box. Arreola struggled with Jackson, and defendant and Copeland joined the struggle and tried to grab his legs as if to pick him up. When facing three assailants instead of just one, Arreola began to fear for his life. None of the three assailants said anything, contributing to Arreola's perception of danger to his life. The jury could reasonably conclude that defendant's conduct went beyond that necessary to commit the underlying crime of attempted robbery and was reasonably likely to provoke a lethal response from Arreola. (See *Gonzalez*, *supra*, 54 Cal.4th at p. 657.) We therefore conclude the evidence was sufficient to support defendant's conviction of provocative act murder.

## C. Instruction to Jury on Provocative Act Doctrine

Defendant contends the trial court erred in its instruction to the jury on the definition of a provocative act. He argues that the trial court's modification of the standard definition of a provocative act was erroneous and created a conclusive presumption on a material element of the murder charge.

### 1. Standard of Review

The correctness of jury instructions is a question of law subject to de novo review. (*People v. Guiuan* (1988) 18 Cal.4th 558, 569.) "'"[I]nstructions should be given a reasonable, not a close and technical, interpretation, and they should be construed in connection with the evidence and the remainder of the charge. Whether a jury has been correctly instructed is not to be determined from a consideration of *parts* of an instruction or from *particular* instructions, but from the *entire* charge of the court."'" [Citation.]

14

Hence, jury instructions must be considered in their entirety.  [Citations.]"  (*Kainzrants*, *supra*, 45 Cal.App.4th at p. 1074.)

### 2. Additional Background

The standard CALCRIM instructions defining provocative act murder state, "A *provocative act* is an act:  [¶]  1.  [That goes beyond what is necessary to accomplish the __ <insert underlying crime>;]  [¶]  [AND  [¶]  2.]  Whose natural and probable consequences are dangerous to human life, because there is a high probability that the act will provoke a deadly response."  (CALCRIM Nos. 560 ("Homicide:  Provocative Act by Defendant") and 561 ("Homicide:  Provocative Act by Accomplice").)

In the instant case, the trial court instructed the jury:  "To prove that the defendant is guilty of murder under the provocative act doctrine, the People must prove the following:  [¶]  1.  In attempting to commit first degree residential robbery the defendant intentionally did a provocative act;  [¶]  2.  The defendant knew that the natural and probable consequences of the provocative act were dangerous to human life and then acted with conscious disregard for life; and  [¶]  [3.]  In response to the defendant's provocative act, Paul Arreola killed Henry Jackson; and  [¶]  4.  Henry Jackson's death was the natural and probable consequence of the defendant's provocative act."

The court continued:  "A provocative act is an act:  [¶]  That goes beyond what is necessary to accomplish in this case the robbery.  *When the underlying offense is robbery, a physical assault on the victim is not an element of the offense, but is an act beyond what is necessary to accomplish the robbery.*  [¶]  A provocative act also is an act whose natural and probable consequences are dangerous to human life, because there is a high

15

probability that the act will provoke a deadly response.  [¶]  In order to prove that Henry Jackson's death was the natural and probable consequence of the defendant's provocative act, the People must prove that:  [¶]  A reasonable person in the defendant's position would have foreseen that there was a high probability that his or her act could begin a chain of events resulting in someone's death;  [¶]  That the defendant's act was a direct and substantial factor in causing Henry Jackson's death; and  [¶]  That Henry Jackson's death would not have happened if the defendant had not committed the provocative act." (Italics added.)

The trial court instructed the jury on the provocative act doctrine as applied to an accomplice as follows:  "Again, a provocative act is an act:  [¶]  That goes beyond what is necessary to accomplish in this case the robbery.  *When the underlying offense is robbery, a physical assault on the victim is not an element of the crime, but is an act beyond what is necessary to accomplish the robbery*;  [¶]  Provocative act is one whose natural and probable consequences are dangerous to human life, because there is a high probability that the act will provoke a deadly response."  (Italics added.)

The trial court further instructed, "When the underlying offense is robbery, any conduct beyond that essential to the commission of the robbery may be a provocative act. *A physical assault on the victim is not an element of the offense, but is an act beyond that necessary to complete a robbery, as I instructed you previously with respect to the two different theories, provocative act murder, which is before you in this case*."  (Italics added.)

16

In discussing the provocative act doctrine during argument to the jury, the prosecutor referred to CALCRIM Nos. 560 and 561 and stated that the provocative act doctrine applied "if in attempting to commit a robbery the defendant intentionally did a provocative act . . . [a]nd if the defendant knew that the natural and probable consequence of the provocative act were dangerous to human life and acted any[]ways, acted with conscious disregard of that knowledge." The prosecutor further argued: "Well, what is a provocative act? *A provocative act is that which goes beyond what is necessary to commit the underlying offense.*" (Italics added.) He continued: "*When the underlying offense is a robbery, any conduct beyond that essential to the commission of the robbery may be a provocative act. A physical assault on the victim is not an element of the offense but is an act beyond that necessary to complete a robbery.* [¶] What does that mean? A robbery can be committed by force or fear. I'm going to make you afraid. Give me your money. A robbery can also—is the fear element. You know, I'm going to beat you if you don't give me your money. That can be a robbery, without any full physical assault. [¶] Okay. In this case there was an actual physical assault. So the determination is did the defendant commit a provocative act, that is, did he do an act, did he do an assault by grabbing the victim's legs, like he was tackling him, he described the football analogy. Did he do that? And, *if he did, that's a provocative act.* Okay. So the question is did someone, other than Henry Jackson, commit a physical assault. The answer is, as it stands right now, the evidence you heard, absolutely." (Italics added.) In rebuttal argument, the prosecutor repeated that "[p]hysical assault on the victim is not an element of the offense, but it is an act beyond that necessary to complete a robbery."

17

*3. Error Analysis*

Defendant challenges the italicized portions of the trial court's instructions to the jury on provocative acts.

Courts in this state have repeatedly cautioned trial courts of the dangers of framing instructions based upon isolated excerpts from case law. (*People v. Cavitt* (2004) 33 Cal.4th 187, 202; *People v. Hayes* (2009) 171 Cal.App.4th 549, 558.) This case presents a classic example of the fallacy of lifting a sentence out of context from a published opinion and incorporating it into the standard jury instruction. In fact, a close reading of the underlying case shows that the single sentence out of context was inconsistent not only with established principles of law but also was unsupported by the actual holding of that case.

The language in the challenged instruction was derived from dicta in *People v. Briscoe* (2001) 92 Cal.App.4th 568, in which the defendant argued that the evidence was insufficient to support his conviction of provocative act murder because his pistol-whipping of a robbery victim was not an act beyond that necessary to commit the robbery. (*Id.* at p. 587.) In rejecting that challenge to the sufficiency of the evidence, the court stated: "It has long been established in provocative act murder cases that when the underlying offense is robbery, any conduct beyond that essential to the commission of the robbery may be a provocative act. Typically, robbery involves an oral or visual demand for money. *A physical assault on the victim or an actual discharge of a weapon is not an element of the offense, but is an act beyond that necessary to complete a robbery.* The beating of a robbery victim with a deadly weapon can constitute a provocative act if it

18

was a life-threatening act. [Citations.]" (*Ibid.*; italics added.) The court further stated that when "the underlying crime does not involve an intent to kill . . . the mere participation in the underlying criminal offense is not sufficient to invoke the doctrine of provocative act murder. The provocative act must be something beyond that necessary to commit the underlying crime. [Citations.] In every robbery, the possibility exists that a victim will resist and kill. The robber has little control over such a killing once the robbery is undertaken . . . . However, circumstances set in motion by the defendant which are fraught with grave and inherent danger to life are sufficient to constitute a provocative act that allows a jury to raise an inference of malice. [Citation.]" (*Id.* at pp. 582-583.) Thus, "[o]ne who robs another while doing no more than holding a weapon *may* not have committed a provocative act, while a perpetrator who brandishes a deadly weapon, puts it to the head of a robbery victim, cocks the gun or pistol-whips the victim with it *may* have." (*Id.* at pp. 589-590; italics added.)

Significantly, in *Briscoe*, the issue of whether the defendant's conduct constituted a provocative act *was* given to the jury. As the court explained in response to the defendant's argument that the pistol whipping was an act inherent in the underlying robbery, "The beating of a robbery victim with a deadly weapon *can* constitute a provocative act if it was a life-threatening act. [Citations.] We are convinced that Briscoe's act of pistol-whipping [the robbery victim] *could* likewise be a provocative act beyond that inherent in the crime of robbery alone. *Thus, we are satisfied that substantial evidence supports the jury's finding of a provocative act sufficient to satisfy the provocative act murder doctrine.*" (*People v. Briscoe*, *supra*, 92 Cal.App.4th at p.

19

587, italics added.)  Moreover, in reviewing the trial court's response to the jury's question during deliberations "whether a robbery at gunpoint constituted a provocative act in and of itself" (*id.* at p. 588), the court concluded that "the issue posed was properly characterized as a question of fact." (*Id.* at p. 589).  The court explained:  "In the real world, robbery at gunpoint may or may not be a provocative act, depending on the degree to which the perpetrator uses the gun.  One who robs another while doing no more than holding a weapon may not have committed a provocative act, while a perpetrator who brandishes a deadly weapon, puts it to the head of a robbery victim, cocks the gun or pistol-whips the victim with it may have.  Thus, the inquiry was one that turned, at least in part, on the particular facts of the case." (*Id.* at pp. 589-590.)

Similarly, in our view, whether a physical assault committed during a robbery constitutes a provocative act is a question of fact to be resolved by the jury.  As the court stated in *People v. Wright* (1996) 52 Cal.App.4th 203, "An assault consists of an attempt couple with the present ability to inflict an 'injury' unlawfully on another; this 'injury' can be the least unwanted touching." (*Id.* at p. 210, fn. omitted, citing *People v. Colantuono* (1994) 7 Cal.4th 206, 214 & fn. 4.)  Thus, although an unwanted touching might constitute a physical assault, it would not necessarily exceed the force necessary to accomplish a robbery, and it was error to instruct the jury otherwise.  For example, in *Joe R.*, our Supreme Court held that the fact that the defendant had struck the victim with his fist on the back of the head before the victim gained possession of the gun and shot the accomplice was not a provocative act because it "did not provoke [the victim's] lethal resistance and was not the proximate cause of [the co-perpetrator's] death." (*Joe R.*,

20

*supra*, 27 Cal.3d at p. 507.) The court held there had been "no life-threatening acts on [the defendant's] part other than those implicit in the crime of armed robbery." (*Id.* at p. 503.)

This is not a circumstance where an isolated instruction is inaccurate, but the error is cured by correct instruction in some other part of the charge. In *Kainrantz*, the defendant contended the trial court erroneously preinstructed the jury on provocative act murder by giving an example that omitted the requirements that the defendant intended to commit an inherently dangerous act over and above the underlying robbery and that the third party's response to the provocation was reasonable. (*Kainzrants*, *supra*, 45 Cal.App.4th at pp. 1073-1074.) The court held, however, that "Taken as a whole, the instructions the trial court delivered in this case state the relevant legal principles fully and clearly. In toto, they are unobjectionable, even though isolated passages from some of the instructions may be subject to criticism. [Citations.] It is not expected that each instruction fully states the law of the case. One instruction may be helpful and explained by another on the same point. The court will look to the pertinent instructions together. [Citations.] [¶] Thus, error cannot be predicated on the fact verbal inaccuracies appear in some parts of the instructions, or that isolated phrases, sentences, or excerpts are open to criticism. [Citations.] Failure of a separate instruction or part of an instruction to contain all of the conditions and limitations that may be gathered from the entire text is not ground for holding the instruction erroneous. [¶] This rule, on the other hand, is inapplicable, where the instruction states an incorrect rule of law. Such an error would

21

not be cured by a correct instruction in some other part of the charge. [Citation.]" (*Id.* at pp. 1074-1075.)

Here, the trial court repeatedly and erroneously instructed the jury that a physical assault is not an element of the offense, but is an act beyond that necessary to complete a robbery. In argument to the jury, counsel repeated the same principle. In short, unlike in *Kainrantz,* no instruction given informed the jury that it was required to determine, on the basis of the facts before it, whether the assault in this case was beyond that necessary to commit robbery.

On any standard, we do not find this error to be harmless. As noted above, on the evidence presented, the jury could reasonably have concluded that defendant's conduct went beyond that necessary to commit the underlying crime of attempted robbery and was reasonably likely to provoke a lethal response from Arreola. But it might also have concluded otherwise, absent the instructional error. As such, it is reasonably probable that a result more favorable to defendant would have been reached in the absence of the error. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.) For the same reason, we cannot confidently say the error was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24.)

We conclude the instructional error requires reversal of defendant's murder conviction.

**D. Instruction to Jury on Proximate Cause Element**

Defendant contends the trial court erred in instructing the jury on the proximate cause element of the proximate act doctrine. Because we have concluded that other instructional error requires reversal, that issue is moot.

## IV. DISPOSITION

Defendant's conviction of murder is reversed. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


HOLLENHORST

J.

We concur:


RAMIREZ

P.J.

MCKINSTER

J.