Filed 1/30/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

<table>
<tr><td>THE PEOPLE,<br><br>     Plaintiff and Respondent,<br>v.<br><br>O'NEAL UNDERWOOD,<br><br>     Defendant and Appellant.</td><td>A162356<br><br>(Contra Costa County<br>Super. Ct. No. 5-034681-7)</td></tr>
</table>

O'Neal Underwood appeals from an order denying his petition for resentencing under former Penal Code section 1170.95 (now § 1172.6).[1]

In the first hour of New Year's Day, 1987, Underwood and an accomplice mugged a pedestrian on Cutting Boulevard in Richmond. During the mugging, Underwood's accomplice stabbed the victim, who died from his wounds. A jury found Underwood guilty of first degree murder and robbery, and he was sentenced to 25 years to life in prison.

Decades after Underwood was convicted, the Legislature amended the murder statutes so that felony murder liability for persons who were not actual killers is now limited to (1) "those who, 'with the intent to kill,' aid or abet 'the actual killer in the commission of murder in the first degree' " and

---

[1] Undesignated statutory references are to the Penal Code. Underwood filed his petition under a version of section 1170.95 that was subsequently amended and then renumbered as section 1172.6. (See *People v. Guiffreda* (2023) 87 Cal.App.5th 112, 117, fn. 1 (*Guiffreda*).)

(2) those who satisfy the felony murder special circumstance, that is, they "were 'major participant[s] in the underlying felony and acted with reckless indifference to human life.' "[2] (*People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*), quoting § 189, subd. (e)(2) and (3); see § 188, subd. (a)(3).)  The Legislature also provided a resentencing procedure for those who had been convicted of murder under the former law to seek retroactive relief under the new law.  (*Strong*, *supra*, 13 Cal.5th at p. 708; see § 1172.6.)

Underwood petitioned for resentencing under the new law.  After an evidentiary hearing, the trial court denied the petition, finding Underwood was ineligible for relief because (1) he aided and abetted murder with intent to kill and (2) he was a major participant in the underlying robbery and acted with reckless indifference to human life.

On appeal, Underwood contends the trial court applied the wrong standard of proof and the prosecution's evidence does not prove he is guilty of first degree murder under current law.  He also argues his attendance at the evidentiary hearing by speakerphone and without a means of confidentially communicating with his counsel violated his constitutional and statutory rights.

We agree with Underwood that the prosecution failed to prove he is guilty of first degree murder under current law because no substantial evidence supports a finding that he intended to kill or acted with reckless

---

[2] When a special circumstance is found under section 190.2, the penalty is death or life in prison without the possibility of parole.  (§ 190.2, subd. (a).)  Thus, felony murder liability is now limited to murders that are death eligible.  (*People v. Wilkins* (2021) 68 Cal.App.5th 153, 165.)  In other words, a defendant can only be held liable for first degree felony murder when the evidence establishes the defendant's own "actions and mental state are sufficiently egregious to potentially warrant [the death] penalty."  (*Strong*, *supra*, 13 Cal.5th at p. 704.)

indifference for human life. Accordingly, we reverse and remand with instructions to vacate the murder conviction and to resentence Underwood in accordance with section 1172.6.

## FACTUAL AND PROCEDURAL BACKGROUND

*Underwood's Murder Conviction*

In 1987, the Contra Costa County District Attorney filed an information charging Underwood with the murder of Albert Vinson (§ 187; count 1) and robbery of Vinson (§ 211; count 2) and alleging he personally used a deadly weapon, a knife, in the commission of both offenses (§ 12022, subd. (b)).

In 1988, a jury found Underwood guilty of first degree murder and robbery but found the deadly weapon allegation not true. Underwood filed a successful petition for writ of habeas corpus based on instructional error, and he was retried in 1992. Again, a jury found him guilty of first degree murder and robbery. The trial court sentenced him to 25 years to life in prison for the murder and three years for the robbery, with the three-year term stayed pursuant to section 654. In 1994, this court affirmed the judgment. (*People v. Underwood* (Mar. 25, 1994, A060027) [nonpub. opn.].)

*1992 Trial Evidence*

At the second trial in 1992, the prosecution presented, among other evidence, testimony from three eyewitnesses to the robbery and murder, evidence of the victim's injuries, and Underwood's statements to the police. We describe the evidence in some detail because the trial court relied on the transcript of this trial at the resentencing hearing.

3

Mary French[3]

On New Year's Eve in 1986, Mary French attended a late evening service at Mount Olive Missionary Baptist Church on Cutting Boulevard in Richmond.  Shortly after midnight on January 1, 1987, she was in the church parking lot.  Another church member, John Marion, was going to give her a ride home, and French was sitting in Marion's truck with his daughter waiting for him.

While sitting in the truck, French noticed something unusual across the street.  A man was walking, and two young men approached him from behind and "pushed him over" in the shrubbery.  French described the two young men as Black, one lighter-skinned and the other darker-skinned.[4]  The victim was on the ground, and the two young men "were straddling" him, with "one on each side."  One of the young men said to the other, "Get that wallet."[5]

French testified the young men "were over the victim" with their hands "going in a motion up and down."  She demonstrated with her right hand in a fist and agreed with the prosecutor that it was "like in a stabbing motion."

----

[3] At the second trial, the parties agreed that French's testimony from the preliminary hearing and first trial could be introduced in lieu of live testimony, and the testimony was read to the jury.

[4] As will be seen, Underwood admitted to the police that he was present at the robbery and murder, but he said it was his friend Fermin Williams who stabbed the victim.  Defendant's cousin—who saw defendant and Williams together just before midnight on New Year's Eve, 1986—testified that Williams was "light skinned" and lighter skinned than defendant.  Another witness also testified Williams was noticeably lighter skinned than defendant.

[5] French testified in direct examination that the lighter-skinned young men said, "Get that wallet," but in cross-examination, she testified, "You couldn't tell who it was from the voices."

Both assailants made the "same motion," which French also described as like "hitting." She heard one of them say, " 'N***r, give me your wallet, or else. Give me this money, or I'll kill you.' "

John Marion and another church member, Willie McNeal, came out to the church parking lot, and French told them, "[D]ial 911, somebody is either getting mugged or murdered." The assailants were "still tussling" with the victim when Marion hollered, "Hey, what's going on over there." The two young men then walked away from the victim. French saw that the lighter-skinned man had a wallet in his hand.

French estimated about five or six minutes, "[o]r maybe less," passed from the time she first noticed the men across the street to when Marion and McNeal came out of the church. At trial, she identified Underwood as the darker-skinned assailant. At the earlier preliminary hearing, however, she could not identify Underwood as one of the assailants.

John Marion

John Marion was a church deacon. After the New Year's Eve service, Marion's 15-year-old daughter and his friend, French, went to his truck and waited, while Marion and Willie McNeal, another deacon, secured the church.

When Marion went out to his truck, either French or his daughter directed his attention across the street and, at the same time, he heard a commotion. At first, Marion "thought it was . . . just a horseplaying thing." Then Marion heard a threat; he testified it was something like, "N***r, you better have some money or I'm going to shoot you, too."[6] After Marion heard

---

[6] On January 1, 1987, however, Marion told the police he heard one of the men say, "N***r, if you don't have any money, I'm going to stab you." The officer who interviewed him testified that Marion did not mention anything about "shooting" on the day of the murder.

the threat, he yelled, "Hey, what is going on over there," or words to that effect, and the two young men ran away. They left together, side by side.

Marion described one of the assailants as Black with dark skin and the other as "light brown." The darker-skinned assailant "was standing at all times," and Marion saw him make "like a stomping motion," although Marion could not say he stomped *on* the victim. Marion saw the lighter-skinned assailant in a kneeling or squatting position "to the victim's right side," but Marion could not remember what he was doing with his hands.[7] Marion thought the darker-skinned man made the threat, but he could not remember exactly. Everything happened "in the blink of an eye."

Willie McNeal

Willie McNeal and Marion secured the building after the New Year's Eve service. When McNeal arrived in the parking lot, Marion pointed out three men across the street. According to McNeal, the men were standing, and then it seemed like all three "kind of stumbled down [to the ground] at one time." They were "struggling." McNeal watched the three men for about a minute or minute and a half before two of them got up and walked away. McNeal did not hear the men say anything.

Vinson's Autopsy

The victim, Albert Vinson, was taken from the scene by ambulance and died on the way to the hospital. The forensic pathologist who autopsied Vinson's body found multiple cuts or incisions on the left hand, which were "very characteristic of defensive type wounds." He also noted abrasion on the left hand, and abrasion in the region of the right hip. Vinson suffered a

---

[7] The officer who interviewed Marion the day of the robbery and murder testified that Marion "indicated he observed both of them striking . . . the victim, and appeared that they were going through his clothing."

three-inch stab wound to the right thigh, a two to two-and-a-half inch stab wound to the right calf, and another stab wound to the left back around the shoulder blade.  The cause of death was the stab wound to the back, which resulted in an accumulation of blood in the left chest cavity and some collapse of the left lung.  The pathologist estimated the knife would have been at least three-and-a-half inches long and about an inch or two wide.  He did not note any bruising in the head area.

Underwood's Statements to the Police

About two weeks after the robbery and murder, Underwood turned himself in, and Sergeant Michael Shipp interviewed him.  Underwood told Shipp that on New Year's Eve, he was waiting at a bus stop for his girlfriend when Fermin Williams came by.  He referred to Williams as his "partner." Williams said, "Let's go kick it," and Underwood thought this meant they would "go get high."

Underwood told Shipp he did not plan to rob the victim and Williams "did the stabbing."  He told Shipp that he and Williams walked past the victim on Cutting and Williams said he was going to rob him.  Underwood "tried to get [Williams] not to rob him.  But [Williams] went back and approached the victim."  Underwood told Shipp that, during the robbery, he was standing on the victim's left side and Williams was on the victim's right. Underwood claimed he tried to help the victim; Williams said something like, "Man, I'm going to kill this mother fucker, I'm gonna kill him," and, at that point, Underwood "reached down to stop [Williams] and stumbled." Underwood reported that, when he stumbled, he fell on his knees and "when he looked up[,] . . . he had blood on his hands."

Underwood said Williams gave him the victim's wallet and told him to go through it.  Underwood "indicated that it was a surprise to him when he

7

saw the knife in [Williams]'s hands. That as they were walking[, Williams] had indicated that he was going to rob the guy. And then when he was being stabbed, that's when [Underwood] realized that [Williams] had a knife in his hand."

*2016 Parole Hearing*

At his parole consideration hearing in November 2016, Underwood was asked to explain his role in the murder. Underwood testified he ran into Williams, they had a few drinks, and he was going to take Williams to his motel room where he was living. He continued, "[W]e decided we wanted to make a few dollars, saw Mr. [Vinson]. . . . [W]e let him pass. We went back and got him, pushed him down in the bushes. A struggle incurred, and I took his wallet. Next thing I know, I had blood on my hands, and we fled." Underwood described the crime as "just a random act." He testified he had not committed a robbery with Williams before this incident, and he and Williams did not talk about what they were going to do, such as what their roles would be, before they robbed Vinson. He maintained that he did not know Williams had a knife and that he did not see Williams stab Vinson. In his risk assessment interview, Underwood said he had no intention of harming the victim and he would not have participated had he known what Williams was willing to do.

Underwood estimated 20 minutes passed from the time he and Williams first saw the victim to when they fled. They were "struggling [with the victim] about five or ten minutes."

*Petition for Resentencing*

Underwood filed a petition for resentencing under former section 1170.95. The trial court issued an order to show cause and set the matter for an evidentiary hearing. The parties submitted briefs, and the prosecution

8

provided the transcripts from the 1988 and 1992 trials and the parole hearing transcript from November 2016.

At the evidentiary hearing, the parties relied on the submitted documents and did not present any new testimony or evidence. The trial court heard argument and took the matter under submission. Two days later, the trial court issued an order denying the petition for resentencing.

## DISCUSSION

A.    *Burden of Proof at the Evidentiary Hearing*

Underwood contends the trial court committed reversible error by failing to apply the beyond-a-reasonable-doubt standard in ruling on his resentencing petition.

When the trial court ruled on Underwood's petition, there was a split of authority on how a court was to decide a petition for resentencing at the evidentiary hearing stage. At that time, the statute governing petitions for resentencing provided that, if a petitioner made "a prima facie showing that he or she is entitled to relief," the petitioner's murder conviction was to be vacated unless the prosecution proved, "beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (Former § 1170.95, subds. (c), (d)(3), as added by Stats. 2018, ch. 1015, § 4.) Some appellate courts had interpreted the statute to mean a trial court deciding a petition at the evidentiary hearing stage was to act as a "quasi-appellate court," that is, the court would review the record to determine whether there was substantial evidence to support a finding that the petitioner was guilty of murder under current law; other appellate courts had held the trial court was to act as an independent factfinder, meaning the court would assess the evidence to decide whether it was convinced the defendant was guilty of murder beyond a reasonable doubt under current law. (*People v. Clements* (2022) 75

9

Cal.App.5th 276, 293–295 (*Clements*) [describing the split of authority and citing cases].)

Recognizing this split, the trial court in this case sided with the authority holding that the resentencing procedure called for substantial evidence review only, as the prosecution had urged. It is now without dispute that the trial court was incorrect on this point. After the trial court issued its decision, the Legislature amended the statute governing petitions for resentencing, resolving the split by "requiring the trial court, acting as an independent factfinder, to determine beyond a reasonable doubt whether defendant is guilty of murder under a valid theory of murder." (*People v. Garrison* (2021) 73 Cal.App.5th 735, 745; see Stats. 2021, ch. 551, § 1 [the amendments "[r]eaffirm[] that the proper burden of proof at a resentencing hearing under this section is proof beyond a reasonable doubt"].)[8]

This does not end our inquiry, however, because the trial court here purported to find in the alternative that Underwood was guilty of first degree murder under current law beyond a reasonable doubt. (See, e.g., *Clements*, *supra*, 75 Cal.App.5th at pp. 297–298 [where the trial court incorrectly applied substantial evidence review in deciding a resentencing petition but also found, in the alternative, that the petitioner "was in fact guilty" of

---

[8] The operative statute now provides, "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. . . . *A finding that there is substantial evidence to support a conviction for murder*, attempted murder, or manslaughter *is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.*" (§ 1172.6, subd. (d)(3), italics added.)

murder, the appellate court did not reverse based on the initial error; it reviewed the alternative finding].)

In its written decision, the trial court discussed the evidence and found the prosecution proved "beyond a reasonable doubt" that Underwood was guilty of first degree murder because he "had the intent to kill and actively assisted the killer in the commission of the murder" and because he "is guilty as a major participant who acted with reckless indifference."

Underwood argues we should not rely on this alternative finding because the trial court did not truly act as an independent factfinder. In support of this argument, Underwood points out that the trial court sometimes referred to inferences that "could" be made by a reasonable trier of fact (rather than inferences the court actually made), and this sounds like the reasoning of a quasi-appellate court engaged in substantial evidence review. But the trial court also found, "the *evidence proves beyond a reasonable doubt* that defendant with intent to kill, aided and abetted Williams in the murder of Vinson" (italics added), and it wrote, "*the court finds* beyond a reasonable doubt that defendant is guilty as major participant who acted with reckless indifference." (Italics added.)

We take the trial court at its word that, acting as an independent factfinder, it reached the conclusion that Underwood is guilty of first degree murder under a viable theory of murder liability. We do not read the trial court's references to what a reasonable trier of fact *could* infer as demonstrating the court was improperly engaged in substantial evidence review. Instead, we understand them as the court explaining its reasons for making its own findings. Underwood's claim that the court applied the wrong standard of proof in its alternative finding is therefore unavailing.

11

B.    *Sufficiency of the Evidence*

We next turn to the question of the sufficiency of the evidence to support the trial court's denial of the petition to resentence.  It is here that we conclude the trial court erred.  There is no dispute that Underwood was not the actual killer.  Thus, the trial court could find Underwood guilty of first degree felony murder based on the robbery of Vinson only if the prosecution proved beyond a reasonable doubt either that he, "with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree" (§ 189(e)(2)) or that he "was a major participant in the underlying felony and acted with reckless indifference to human life" ((§ 189(e)(3)).

Underwood contends the prosecution failed to show he intended to kill or acted with reckless indifference to human life.  We agree.

1.    <u>Standard of Review</u>

Underwood asks us to review the evidence independently rather than for substantial evidence.  Underwood argues we need not defer to the trial court's factual findings, first, because the trial court failed to act as an independent fact finder and, second, because the court's findings are based on a cold record, not live testimony and associated credibility determinations.  As we have just described, we have already considered Underwood's first reason and found it lacking.

As to Underwood's second reason, his argument is based on *People v. Vivar* (2021) 11 Cal.5th 510.  However, appellate courts that have considered this argument have uniformly rejected it, and we agree with their analysis. (See, e.g., *People v. Njoku* (2023) 95 Cal.App.5th 27, 43; *People v. Werntz* (2023) 90 Cal.App.5th 1093, 1110, review granted August 9, 2023, S280278; *People v. Oliver* (2023) 90 Cal.App.5th 466, 480; *People v. Sifuentes* (2022) 83

12

Cal.App.5th 217, 232–233; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 591; *Clements*, *supra*, 75 Cal.App.5th at p. 301.) For example, Division Four of our court distinguished *Vivar*, explaining the trial court's decision on review in that case involved predominantly legal questions, whereas a trial court's decision denying a petition under section 1172.6 following an evidentiary hearing is predominantly a question of fact. (*Sifuentes*, at pp. 232–233.) Where the trial court's decision on review is predominantly a question of fact, the appellate court reviews the record for substantial evidence. (*Id.* at p. 233, citing *People v. Perez* (2018) 4 Cal.5th 1055, 1066.)

In our case, whether Underwood aided and abetted his confederate with an intent to kill or with reckless indifference to human life are predominantly questions of fact. Accordingly, we review the trial court's factual findings for substantial evidence. (*Clements*, *supra*, 75 Cal.App.5th at p. 301.) "We ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' " (*Id.* at p. 298.) We review the whole record, "not just the evidence favorable to the respondent[,] to determine if the evidence supporting the verdict is substantial in light of other facts." (*People v. Holt* (1997) 15 Cal.4th 619, 667.)

2. <u>Intent to Kill</u>

The trial court found "defendant had the intent to kill and actively assisted the killer in the commission of the murder."

In reaching its finding, the court relied on evidence that Williams threatened the victim, "give me the wallet or I'll kill you." The court cited this threat as showing that Underwood therefore "*knew* Williams was going

13

to use a knife to kill the victim." (Italics added.) We do not believe this is a reasonable inference in light of other facts. Here, it is undisputed that Underwood and Williams intended to rob Vinson, and robbery, by definition, involves taking personal property "by means of force or fear." (§ 211.) As Underwood argues, "orders to hand over property under threats are inherent in a robbery and do not show that all participants know the perpetrator intends to kill." (Cf. *In re Joe R.* (1980) 27 Cal.3d 496, 507–508 [a defendant's conditional threats to a robbery victim to follow a confederate's order "or 'he'll kill you' " were found to be "directed toward safe completion of the underlying felony," and not "intentional and malicious acts, in addition to the underlying robbery"].)

In this case, there is no evidence that Williams and Underwood had any motive other than to obtain money when they targeted Vinson and pushed him off the sidewalk; nothing suggests either of them knew the victim or held any animus toward him. Nor is there any evidence that Underwood knew Williams had a weapon when Underwood decided to rob the victim. Under these circumstances, it is not reasonable to infer that Underwood would *know* his confederate actually intended to kill their robbery victim— and not merely steal from him—upon hearing a conditional threat such as "give me the wallet *or* I'll kill you." (Italics added.)

The trial court also asserted, "According to Underwood's own admission, he knew Williams's intent was to kill the victim when he continued to hit him thereby further assisting to immobilize the victim." But the court cited no record evidence for this assertion, and no evidence supports a finding that Underwood continued to hit the victim after becoming aware that Williams intended to kill him. The trial testimony shows Underwood reportedly told Sergeant Shipp that Williams said something like, "Man, I'm

14

going to kill this mother fucker, I'm gonna kill him," and Underwood claimed he tried to stop Williams. The trial court did not believe that Underwood tried to stop Williams, a credibility determination it was, of course, free to make. However, this does not mean the court could simply assume that, after hearing Williams say this, Underwood "continued to hit" the victim when no evidence suggests that Underwood continued to hit the victim after such a threat was made.[9]

Attempting to justify the trial court's finding, the Attorney General asserts that, after Underwood heard Williams's threat to kill Vinson, Underwood "had time to process such a threat and act." He cites Underwood's estimate at his parole hearing 30 years later that the struggle with the victim lasted "about five or ten minutes." But Underwood did not say he struggled with the victim *after* Williams said he was going to kill the victim. The Attorney General also notes that "William used the knife for more than one quick stab" as the autopsy showed "three stab wounds, in addition to multiple defensive cuts to Vinson's fingers." This, he argues, shows "[t]here was plenty of time to process and act, and certainly enough time to form an intent to aid and abet Williams in the murder." While it is possible to form an intent to kill very quickly, we fail to see how it reasonably may be inferred from the prosecution's evidence that Underwood himself

---

[9] Eyewitnesses French and Marion heard only a conditional threat, which, as we have discussed, would not have put Underwood on notice that Williams actually intended to kill the victim. Further, there is scant evidence from which it reasonably could be inferred that Underwood "continued to hit" the victim at any time. The pathologist noticed no evidence of bruising around the victim's head and neck, and, other than the stab wounds, the only noted injuries on the victim's body were abrasions on his left hand and right hip. Thus, no physical evidence supports a finding the victim was repeatedly hit by Underwood in addition to being stabbed by Williams.

15

formed an intent to kill in the brief span of time between when he may have realized his confederate might kill (and not merely steal from) the victim and when his confederate fatally stabbed the victim. In other words, even assuming it could be inferred that Underwood at some point realized Williams intended to kill, the circumstances do not support a reasonable inference that he *shared* that murderous intent. (See *In re Lopez* (2023) 14 Cal.5th 562, 585 [" 'the aider and abettor must know and share the murderous intent of the actual perpetrator' "].)

Nor does any other evidence cited by the trial court or the Attorney General show Underwood harbored an intent to kill. The trial court noted that Underwood and Williams were together prior to, during, and after the robbery and murder and found that their "actions were coordinated when the encountered Vinson on Cutting Boulevard." Their coordination certainly demonstrates a shared intent to *rob* Vinson, but it does not support a reasonable inference that Underwood intended to kill him.

In short, we find no evidence that is reasonable, credible, and of solid value supporting a finding that Underwood, *with intent to kill*, assisted Williams in the commission of murder in the first degree.

3.    Reckless Indifference to Human Life

The trial court also found Underwood guilty of first degree murder under section 189(e)(3), which permits felony murder liability when "[t]he person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." This, too, was error.

a.    *Legal Principles*

The phrases "major participant" and "reckless indifference to human life" are taken "from United States Supreme Court precedent concerning the

16

permissible scope of capital punishment for felony murder." (*Strong, supra*, 13 Cal.5th at p. 705.) Consequently, our interpretation of the phrases is guided by case law "delineat[ing] the limits on capital punishment for felony murder under the Eighth Amendment of the federal Constitution." (*Ibid*.)

Our high court has explained that "[r]eckless indifference to human life ' "requires the defendant be '*subjectively* aware that his or her participation in the felony involved a *grave risk of death*.' " ' " (*People v. Banks* (2015) 61 Cal.4th 788, 807, some italics added.) "Awareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient; only knowingly creating a 'grave risk of death' satisfies the constitutional minimum." (*Id*. at p. 808.) Planning and participating in an armed robbery, "without more, does not establish reckless indifference to human life." (*In re Scoggins* (2020) 9 Cal.5th 667, 682 (*Scoggins*).) We have further observed that "the 'reckless indifference to life' necessary for death penalty eligibility [and, by extension, felony murder liability under section 189(e)(3),] requires subjective awareness of a higher degree of risk than the 'conscious disregard for human life' required for conviction of second degree murder based on implied malice." (*People v. Johnson* (2016) 243 Cal.App.4th 1247, 1285.)

"Examples [of reckless indifference to human life] include 'the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property.' [Citation.] Reckless indifference 'encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.' " (*Scoggins, supra*, 9 Cal.5th at pp. 676–677.)

17

Determining whether a defendant had the mental state required to find reckless indifference to human life depends on "the totality of the circumstances." (*Scoggins*, *supra*, 9 Cal.5th at p. 677.) Relevant considerations include (1) "use of or awareness of the presence of a weapon or weapons," (2) "physical presence at the scene and opportunity to restrain confederates or aid victims," (3) "the duration of the crime," (4) "knowledge of any threat the confederates might represent," and (5) "efforts taken to minimize risks." (*Strong*, *supra*, 13 Cal.5th at p. 706, citing *People v. Clark* (2016) 63 Cal.4th 522, 618-623 (*Clark*).)

> b.     *Application*

Viewing the record in the light most favorable to the trial court's order and considering the totality of the circumstances, we conclude substantial evidence does not support a finding that Underwood acted with reckless indifference to human life such that his own "actions and mental state are sufficiently egregious to potentially warrant [the death] penalty." (*Strong*, *supra*, 13 Cal.5th at p. 704; see fn. 2, above.)

First, no evidence shows Underwood knew Williams had a knife when Underwood decided to rob a pedestrian with him, and Underwood himself was unarmed. (See *Guiffreda*, *supra*, 87 Cal.App.5th at p. 126 [where the defendant did not use a weapon and there was no "evidence that she knew a weapon of any kind would be used during the robbery," "this factor weighs heavily in favor of finding [the defendant] did not act with reckless indifference"]; *Scoggins*, *supra*, 9 Cal.5th at p. 677 [consideration of weapon use did not weigh in favor of finding reckless indifference where the defendant "did not use a gun, nor did he know that a gun would be used during the felony"].)

18

Second, the duration of the interaction between the perpetrators and the victim was brief; only a few minutes passed from the time Underwood and Williams approached Vinson to when they fled. (See *Guiffreda*, *supra*, 87 Cal.App.5th at pp. 127–128 [where the entire interaction between the perpetrators and the victims lasted less than ten minutes and the robbery appeared to be a "spontaneous crime of opportunity," the duration factor weighed against finding that the defendant exhibited reckless indifference to human life]; *Scoggins*, *supra*, 9 Cal.5th at p. 681 [an interaction lasting "three to five minutes" did not weigh in favor of finding reckless indifference] *People v. Keel* (2022) 84 Cal.App.5th 546, 560–561 (*Keel*) [where the events unfolded rapidly and the evidence suggested the defendant's confederate shot the victim in a somewhat impulsive response to resistance, the duration factor "significantly reduces [the defendant]'s culpability"].)[10]

Third, nothing suggests Underwood knew Williams had a propensity for violence or was likely to use lethal force before the robbery. There was no evidence, for example, that Underwood "knew [Williams] had any violent past convictions or had committed violent crimes." (*Guiffreda*, *supra*, 87

---

[10] The facts of *Guiffreda*, *Scoggins*, and *Keel* contrast with circumstances in which the duration of the interaction between the perpetrators of the felony and the victims would tend to show reckless indifference. For example, where the defendants "kidnapped and guarded the victims at gunpoint while their father decided whether to kill the victims," these facts may suggest reckless indifference to human life. (*Scoggins*, *supra*, 9 Cal.5th at p. 680, describing the facts of *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*).) Our high court has observed, "Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for *prolonged periods*, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark*, *supra*, 63 Cal.4th at p. 620, italics added.) The brief time during which Underwood and Williams struggled with the victim does not constitute a prolonged period in this analysis.

Cal.App.5th at p. 128.)  Thus, the fact that he undertook a robbery with Williams does not show Underwood subjectively appreciated that his own participation in the robbery was "*likely* to result in the taking of innocent life."  (Cf. *Tison*, *supra*, 481 U.S. at pp. 151–152, italics added [where, among other things, the defendants supplied firearms to two convicted murderers, the facts "support[ed] a finding that they both subjectively appreciated that their acts were likely to result in the taking of innocent life"].)

Fourth, it appears Underwood intended only to overpower the victim and take his wallet, not to participate in an *armed* robbery.  " '[T]he need to minimize the risk of violence when planning an unarmed [robbery] is less pressing than the need to minimize the risk of violence when planning an armed robbery.' "  (*Scoggins*, *supra*, 9 Cal.5th at p. 683 [where the record contained no " 'indication the defendant planned a beating involving the use of weapons,' " that fact was " 'by itself, a significant step towards minimizing the likelihood that the plan would result in a "grave risk of death" ' "].)

All of these considerations militate against a finding that Underwood acted with reckless indifference to human life.

Balanced against these considerations is Underwood's presence at the murder.  This fact bears on his culpability but is not dispositive.  In *Keel*, *supra*, 84 Cal.App.5th at pages 553–554, for example, the defendant and a confederate robbed a victim at gunpoint, and the confederate shot the victim in defendant's presence.  The Court of Appeal found this to be a "neutral" factor in the analysis of whether substantial evidence supported a finding of reckless indifference to human life:  "On the one hand, [the defendant] was present at the scene of the shooting, which allowed him to observe [his confederate]'s actions and ostensibly gave him at least some chance to act as a moderating force," but, on the other hand, " '[t]he decision to rob was made

quickly,' and [the confederate]'s decision to shoot was apparently made even more quickly in response to [the victim]'s unexpected resistance and efforts to flee." (*Id.* at p. 560.) Under these circumstances, the court was "not persuaded [the defendant] had a meaningful opportunity to restrain [his confederate] or intervene before" his confederate shot the victim. (*Ibid.*) Similarly, in *People v. Ramirez* (2021) 71 Cal.App.5th 970, 979, (*Ramirez*) the defendant was present during an attempted carjacking in which his accomplice shot and killed the victim. The reviewing court, however, found no substantial evidence of reckless indifference to human life where the defendant did not have "a meaningful opportunity to intervene" and "the rapid pace of the crime d[id] not support a finding of reckless indifference." (*Id.* at p. 989.)

In contrast to *Keel* and *Ramirez*, *Tison* illustrates when a defendant's presence at the scene of a killing would support a finding of reckless indifference to human life. "The defendants in *Tison* were physically present during the entire sequence of events that resulted in the victims' deaths. (*Tison, supra*, 481 U.S. at p. 158.) The Tison brothers flagged down the car containing the victims, kidnapped and robbed them, guarded them while their father decided what to do, and eventually watched their father shoot the victims. (*Id.* at pp. 139–141.) During that time, the defendants knew that their father was debating whether to kill the victims and had *ample opportunity to restrain the crime* and aid the victims. (*Id.* at p. 140.) Because the defendants did neither, the high court reasoned, they exhibited reckless indifference to human life." (*Scoggins, supra*, 9 Cal.5th at p. 678, italics added.) Significantly, the Tison brothers "were physically present at the scene where a *long sequence of events* culminated in murder." (*Id.* at p. 679, italics added.)

21

Here, Underwood was not present for a long sequence of events that culminated in murder. The mugging and stabbing unfolded within a few minutes—in a "blink of an eye" according to Marion—making this case more like *Keel* and *Ramirez* than *Tison*. Given the short duration of the crime, it cannot be said that Underwood had ample opportunity to restrain Williams from stabbing the victim. And, as we have discussed, the evidence does not support an inference that Underwood knew Williams was going to stab the victim and then continued to hit the victim.

In arguing there is sufficient evidence of reckless indifference, the Attorney General relies on *People v. Smith* (2005) 135 Cal.App.4th 914, 927, overruled on another ground as recognized in *In re Bennett* (2018) 26 Cal.App.5th 1002, 1018, but the case is distinguishable. In *Smith*, the physical evidence showed the victim was "beaten severely" in the head and face, "she suffered 27 knife wounds," "[h]er head had been slammed against the wall, leaving a hole in the drywall," an electrical cord from a broken steam iron was wrapped around her neck, and blood was found in several places in her motel room. (*Id.* at p. 919.) The appellate court found that, even if the defendant remained outside the motel room while his accomplice killed the victim, he could have "gained a 'subjective awareness of a grave risk to human life' during the many tumultuous minutes it would have taken for [the victim] to be stabbed and slashed 27 times, beaten repeatedly in the face with a steam iron, and had her head slammed *through* the wall." (*Id.* at p. 927.) The killing in the present case is not comparable; Vinson suffered three stab wounds, and there is no evidence that he was beaten or strangled. On this record, it cannot reasonably be inferred that Underwood gained

22

subjective awareness of a grave risk to human life between the time Williams started to stab the victim and when he inflicted the fatal wound.[11]

Considering the totality of the circumstances, the evidence shows Underwood participated in a crime of opportunity that was spontaneous and happened quickly. (See, e.g., *Guiffreda*, *supra*, 87 Cal.App.5th at p. 128 ["the robbery appears to have been a purely spontaneous crime of opportunity committed simply because [the victim] was walking around the motel with a bank envelope sticking out of his back pocket"]; *Keel*, *supra*, 84 Cal.App.5th at p. 562 [the robbery was "a crime of opportunity" that was "unplanned, spontaneous, and short in duration"].) But no substantial evidence supports a finding that he acted with reckless indifference to human life.

4.    Conclusion

The record lacks substantial evidence supporting a finding either that Underwood had intent to kill or that he acted with reckless indifference to human life. The prosecution, therefore, failed to meet its burden to prove, beyond a reasonable doubt, that Underwood is guilty of murder under current law, and Underwood is entitled to resentencing relief. (§ 1172.6, subd. (d)(3); see *Keel*, *supra*, 84 Cal.App.5th at p. 563 [where no substantial evidence showed reckless indifference to human life, "the prosecution failed to carry its

---

[11] Moreover, *People v. Smith* was decided before the California Supreme Court "substantially clarified the law governing" the evidence required to find a person was a "major participant" in an underlying felony who acted with "reckless indifference to human life." (*Strong*, *supra*, 13 Cal.5th at p. 706.) It is questionable whether *Smith* would be decided the same way after *People v. Banks*, *supra*, 61 Cal.4th 788, *Clark*, *supra*, 63 Cal.4th 522, and *Scoggins*, *supra*, 9 Cal.5th 667. (See *Strong*, at p. 717 ["[t]here are many petitioners with pre-*Banks* and *Clark* felony-murder special-circumstance findings [(meaning they were found to have acted with reckless indifference to human life)] who nevertheless could not be convicted of murder today"].)

burden of proving, beyond a reasonable doubt, that [the petitioner] remains 'guilty of murder' under our state's current murder laws," and the resentencing petition "must therefore be granted"].)[12]

**DISPOSITION**

The order denying Underwood's petition for resentencing is reversed. The trial court is directed to vacate Underwood's murder conviction and resentence him in accordance with section 1172.6.

---

[12] Underwood's remaining appellate claim relates to his participation in the evidentiary hearing. Section 977.2 governs court appearances for defendants who, like Underwood, are incarcerated in state prison. It generally permits "all court appearances in superior court, except for the preliminary hearing and trial, to be conducted by two-way electronic audiovideo communication between the defendant and the courtroom in lieu of the physical presence of the defendant in the courtroom." (§ 977.2, subd. (a).) The statute further requires the trial court and the Department of Corrections and Rehabilitation to provide "a confidential telephone line between the court and the institution for communication between the defendant's counsel in court and the defendant at the institution." (*Id.* subd. (c).)

Here, the trial court held the evidentiary hearing while Underwood listened on speakerphone from prison without a means of confidentially communicating with his counsel. The Attorney General concedes this violated Underwood's statutory right under section 977.2, subdivision (c), to a confidential telephone line with counsel, but argues there was no prejudice. Because we conclude Underwood's resentencing petition must be granted, we need not resolve this claim. Nonetheless, we observe that the "twin purposes" of a defendant's presence at the evidentiary hearing on a section 1172.6 petition are "to potentially offer testimony or evidence upon hearing the prosecution's case, and to assist counsel" (*People v. Quan* (2023) 96 Cal.App.5th 524 [314 Cal.Rptr.3d 618, 628], rehg. den. (Nov. 14, 2023), review den. (Dec. 27, 2023)), and both of these purposes are frustrated when an incarcerated defendant is unable to communicate confidentially with his counsel.

_____

Miller, J.

WE CONCUR:

_____

Richman, Acting P.J.

_____

Markman, J.*

A162356, *People v. Underwood*

---

* Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Court:  Contra Costa County Superior Court

Trial Judge:  Hon. Rebecca C. Hardie

Mary K. McComb, State Public Defender, Loretta Johnson, Deputy State Public Defender, for Defendant and Appellant

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Arthur P. Beever, Shirin Oloumi, Deputy Attorneys General, for Plaintiff and Respondent

A162356, *People v. Underwood*